967 So.2d 155 (2007)
Juan Raul CUERVO, Petitioner,
v.
STATE of Florida, Respondent.
No. SC06-1156.
Supreme Court of Florida.
July 12, 2007.
Rehearing Denied October 15, 2007.
*157 James S. Purdy, Public Defender, Thomas J. Lukashow and Leonard R. Ross, Assistant Public Defenders, Seventh Judicial Circuit, Daytona Beach, FL, for Petitioner.
Bill McCollum, Attorney General, Tallahassee, FL, Kristen L. Davenport and Kellie A. Nielan, Assistant Attorneys General, Daytona Beach, FL, for Respondent.
PARIENTE, J.
We review Cuervo v. State, 929 So.2d 640 (Fla. 5th DCA 2006), which is in express and direct conflict with State v. Owen, 696 So.2d 715 (Fla.1997), Traylor v. State, 596 So.2d 957 (Fla.1992), and Dooley v. State, 743 So.2d 65 (Fla. 4th DCA 1999), on the admissibility of statements made by a suspect in response to police questioning after the suspect has indicated that he or she wishes to remain silent. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. For the reasons explained in this opinion, we quash Cuervo and approve Dooley.

FACTS AND PROCEDURAL HISTORY
Cuervo was convicted of attempted first-degree murder with a weapon and burglary of a conveyance with an assault or battery with a weapon following a trial in which his confession was introduced over defense objection. The evidence and testimony presented in the hearing on Cuervo's motion to suppress his confession centered on his custodial interrogation at the Osceola County Sheriff's Office. Cuervo spoke only Spanish and Detective Deborah Palmieri, the lead investigator on the case, spoke only English. Therefore, a Spanish-speaking officer, Deputy David Garcia, was brought in to translate so that Palmieri and Cuervo could communicate. At Palmieri's direction, Garcia read Cuervo his Miranda[1] rights in Spanish, based on a pre-printed form in Spanish prepared by the Sheriff's Office. After reading him all of his rights, Garcia then asked Cuervo if he understood all of "the rights I have just explained to you? Yes or No?"*[2] Cuervo responded "yes."* Garcia then asked Cuervo, "Do you wish to talk about the matter and make a statement, yes or no?" * Cuervo replied, "No quiero declarar nada," which literally translates as "I don't want to declare anything." Garcia then confirmed to Cuervo, "You don't want to say anything, okay."*
Garcia then told Palmieri, "He does not wish to talk with us." In response, Palmieri asked Garcia to have Cuervo initial each one of the rights to make sure that he understood them. Garcia told Cuervo to initial each statement of a right on the form and sign at the X near the bottom. Cuervo complied. It is at this point that the following exchange ensued:
Palmieri: You can explain to him that at this time if he does wish to speak with us, that he can give us his side of the story. If he doesn't wish to, that's his *158 right. He does not have to. Just let him know that.
Garcia: Okay, she is explaining that now would be your opportunity if you wish to speak and explain your side of the story, your version of what happened. If you wish to talk, you don't have to. You are not obligated to, but if you wish to talk there's still time.*
Cuervo: I don't if she talked and made her story and her and her mother . . . *
Garcia: Uh huh.
Cuervo: . . . are people who have been in this country for thirty years and can use something against me (inaudible).*
Garcia: Okay.
Cuervo: Uh, I have (inaudible) the only thing I have to say that she and her mother (inaudible) . . . *
Garcia: Mm hm.
Cuervo: . . . and I (inaudible). That's the only thing I have to say.*
Garcia: Okay, let me translate a little to her so that I can then tell you (inaudible).*
Um, he's saying that um, he does, he does not wish to speak because he doesn't know if the victim already said anything um, or the victim's mother, `cause uh, he's afraid that they've been here for thirty years or more and that they can use anything against him to um, (inaudible).
Palmieri: Okay. Does he have an attorney that we can speak with?
Garcia: Do you have a lawyer that you want to speak to?*
Cuervo: I don't have a lawyer. I don't know anyone in this country (inaudible).*
Garcia: Okay. He doesn't know anybody in this country. He does not have an attorney. Um, he's by himself in this country. He doesn't have any family (inaudible).
Palmieri: Okay, so at this time, he's refusing to talk?
Garcia: Okay, so at this time you don't wish to talk to us or answer any questions?*
Cuervo: You can ask questions and I'll answer if I (inaudible).*
Garcia: So you do wish to talk to us because we need to have that clear (inaudible).*
Cuervo: I want to talk to everyone.*
Garcia: Okay.
Cuervo: Who ever wants to talk to me talk.*
During the evidentiary hearing on Cuervo's motion to suppress his confession, Palmieri explained why she did not stop the interview when Garcia told her that Cuervo said he did not want to talk to the officers:
Well, basically, understand that there was the communication barrier and it's hard for me to understand what's going on when someone else is speaking Spanish. Originally, I told Deputy Garcia to have himread him the rights, and to have him initial to make sure he understands. And, I guess, at that point Deputy Garcia told me he does not want to talk. But when I looked down at the paperwork, it showed that he did not sign it. So I told him please go back, have him initial it, and make sure he understands. And I said make sure he understands this is his opportunity to speak. But I just wanted to make sure that was clear, only because he didn't speak [English] and I wanted to make sure he knew his rights, and I wanted it initialed.
The trial court first determined that the actual translation of what Cuervo stated to *159 Garcia was "No, I don't want anything." The trial court then found, given this translation, that Cuervo's response was equivocal and that the exchange that followed was only for clarification and did not amount to a violation of Cuervo's constitutional rights.
Although the Fifth District translated Cuervo's response as he did not want to "declare anything," Cuervo, 929 So.2d at 641, the district court agreed with the trial court's ruling:
At the very least, the brief exchange between Palmieri and Cuervo, with Garcia translating, was sufficiently uncertain to allow clarifying questions. The entire dialogue took only about five minutes and arose in the context of a translation. Cuervo began by responding that he did not want to "declare anything." The follow-up question elicited from him an odd narrative about his family that was the opposite of "not speaking" and which compounded the ambiguity about whether he wished "to speak" or not. In response to the question about whether he had counsel the police could talk to, he responded by volunteering to answer questions put to himor notas he chose. In the entire exchange, there was manifestly no coercion of any sort, no effort to overcome a settled decision to invoke his right to remain silent, no interrogation.
. . . .
Bright lines are valuable tools in this area of the law, but there is nothing in this brief exchange, as it is communicated back and forth in two languages for which the protection of Miranda is required. When asked point blank if he was refusing to speak, Cuervo could simply have said, "yes." He chose, instead, to hear the investigator's questions and to respondor not, as he chose.
Id. at 642-43. Accordingly, the Fifth District affirmed Cuervo's convictions.
Judge Thompson dissented. He concluded that the majority improperly relied on State v. Owen, 696 So.2d 715 (Fla.1997), for the proposition that phrases such as "I don't want to talk about it" and "I'd rather not talk about it" are equivocal:
In contrast to Owen, Cuervo made two statements that clearly showed he did not wish to speak to the police. . . . Both officers specifically testified that Cuervo stated he did not want to speak to them; that expression sufficed. See Smith v. State, 915 So.2d 692 (Fla. 3d DCA 2005) (dismissing State's contention that defendant's assertion was ambiguous). Courts have held that admitting statements after such an expression is error, even if improper questioning quickly leads a suspect to change his mind. See Dooley, 743 So.2d at 67-69.
Here, the State's argument that Palmieri's questions were clarifying rather than substantive is sleight of hand. Taken to its logical conclusion, an officer can testify that clarifying questioning continued because the defendant appeared confused or puzzled. An officer could also state that, in light of defendant's minimal education, clarification was needed to be sure the defendant understood his rights. If nothing else, Miranda stands for the proposition that police questioning must stop when the defendant invokes his rights.
929 So.2d at 644 (Thompson, J., dissenting). We granted review based on express and direct conflict with our decisions in Traylor and Owen and the Fourth District's decision in Dooley.

ANALYSIS
This case presents two interrelated issues regarding the admissibility of Cuervo's confession. First, did Cuervo invoke *160 his right to remain silent during custodial interrogation? Second, if Cuervo invoked the right, did the State scrupulously honor his choice? In the discussion that follows, we set out the applicable standard of review and the governing legal principles regarding invocation of the right to terminate custodial questioning, then apply these principles to explain our conclusion that the State impermissibly continued to question Cuervo after he had exercised his right to remain silent. Finally, we discuss why the error requires reversal of Cuervo's convictions.

I. STANDARD OF REVIEW
An appellate court reviewing a ruling on a motion to suppress presumes that a trial court's findings of fact are correct and reverses those findings only if they are not supported by competent, substantial evidence. Connor v. State, 803 So.2d 598, 608 (Fla.2001). Appellate review of the trial court's application of the law to the historical facts is de novo. Id. Accordingly, "appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the . . . Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution." Fitzpatrick v. State, 900 So.2d 495, 510 (Fla.2005) (quoting Nelson v. State, 850 So.2d 514, 521 (Fla.2003)).
In this case, the entire interrogation, including the Miranda colloquy, was recorded on an audiotape which we have reviewed. This assists us in assessing whether the trial court's finding that Cuervo failed to unequivocally invoke his right to remain silent is based on competent, substantial evidence.

II. APPLICABLE LAW
Article I, section 9 of the Florida Constitution provides in pertinent part that "[n]o person shall . . . be compelled in any criminal matter to be a witness against oneself." This fundamental right is mirrored in the Fifth Amendment to the United States Constitution.[3] Statements obtained from a defendant in violation of the right against self-incrimination (also known as a "privilege") cannot be used against the defendant at trial. "The State bears the burden of proving by a preponderance of the evidence that a confession is voluntary and thus admissible." Davis v. State, 859 So.2d 465, 482 (Fla.2003).
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court instituted certain procedural safeguards to protect suspects' Fifth Amendment right against self-incrimination:
Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.
Id. at 444-45, 86 S.Ct. 1602. The Court emphasized that an individual who communicates *161 that he or she wishes to remain silent invokes the Fifth Amendment right, requiring that questioning cease:
Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.
Id. at 473-74, 86 S.Ct. 1602 (footnote omitted). The Court has stated that the prophylactic rule of Miranda "sweeps more broadly than the Fifth Amendment itself," Oregon v. Elstad, 470 U.S. 298, 306, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and encompasses statements that may not have been "involuntary in traditional terms." Miranda, 384 U.S. at 457, 86 S.Ct. 1602.
In Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court concluded that a suspect who had invoked his right to counsel was not interrogated within the meaning of Miranda when, in the suspect's presence, officers discussed the danger of a child finding a gun the suspect might have discarded. The Court defined interrogation for these purposes as follows:
[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.
Id. at 300-02, 100 S.Ct. 1682 (footnotes omitted).
This Court has interpreted article I, section 9 of the Florida Constitution as standing for the simple proposition that "if the suspect indicates in any manner that he or she does not want to be interrogated, interrogation must not begin or, if it has already begun, must immediately stop." Traylor, 596 So.2d at 966. Similarly, the United States Supreme Court has held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his `right to cut off questioning' was `scrupulously honored.'" Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). However, that Court has also concluded that once a defendant waives his or her right to remain silent, subsequent equivocal requests to terminate an interrogation do not automatically require police to cut off all questioning. Davis v. United States, 512 U.S. 452, 459-62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Although recognizing that it might "often be good police practice for the interviewing officers to clarify whether or not" the defendant wants an attorney, the Court declined to "adopt a rule requiring officers to ask clarifying *162 questions" rather than continue with the interrogation. Id. at 461-62, 114 S.Ct. 2350.
We followed Davis in Owen, in which we held that "police in Florida need not ask clarifying questions if a defendant who has received proper Miranda warnings makes only an equivocal or ambiguous request to terminate an interrogation after having validly waived his Miranda rights." 696 So.2d at 719 (emphasis supplied).[4] During the actual interrogation, the police asked about what this Court "characterized as relatively insignificant details of the crime." Owen, 696 So.2d at 717. In response to the specific questioning, Owen stated, "I'd rather not talk about it." Id. n. 4.
In Almeida v. State, 737 So.2d 520 (Fla. 1999), we again emphasized that the holding in Owen regarding equivocal requests "applies only where the suspect has waived the right earlier during the session." Id. at 523 n. 7. We also reaffirmed the statement in Owen that "police similarly must honor a clear statement invoking a suspect's rights" and further held that "police must answer a clear question concerning a suspect's rights." Id. at 526. We stated that these "twin rulings" in Owen and Almeida "establish an unmistakable bright line for law enforcement." Id.

III. THIS CASE

A. Invocation of the Right to Remain Silent
Because Cuervo did not speak English, a Spanish-speaking police officer, Garcia, translated for the interrogating police officer, Palmieri. Garcia proceeded to explain to Cuervo each of his rights in Spanish and asked him if he understood. After reading and translating all of the rights, Garcia asked the suspect, "Do you understand all of the rights I have just explained to you? Yes or no?"* to which Cuervo responded in the affirmative. Garcia then asked Cuervo if "you wish to talk about the matter and make a statement, yes or no?"* to which Cuervo answered, "No quiero declarar nada," which literally translates as "I don't want to declare anything." Importantly, it is uncontroverted that Garcia then told Palmieri that "[h]e does not wish to talk with us."
At the hearing on the motion to suppress, questions arose both as to what Cuervo stated in Spanish and the exact translation of his statement in English. Garcia, who was present during the actual interrogation, testified that the tape indicated Cuervo said, "No quiero declarar nada," which means "I don't want to declare anything." However, the trial judge found, based on the testimony of the interpreter who was present at the hearing, that the correct translation was "No, I don't want anything."[5]
We conclude that the trial court's finding of fact that Cuervo stated, "I don't want anything" is not supported by competent, substantial evidence.[6] As noted by Justice Bell in his dissenting opinion, the audiotape reveals that Cuervo stated, "No *163 quiero declarar nada," which means "I don't want to declare anything." Dissenting op. at 172. Garcia, who was present during the actual interrogation, testified that the tape indicated Cuervo said, "No quiero declarar nada." The Fifth District used the translation that Cuervo did not want to "declare anything." Cuervo, 929 So.2d at 641. And it is undisputed that at the time the statement was made, Garcia and Palmieri both understood that Cuervo did not wish to talk to them.[7] Accordingly, for purposes of our review, we conclude that Cuervo's statement to Garcia was "No quiero declarar nada," or "I don't want to declare anything."
The statement by Cuervo, as translated by Garcia for Palmieri, constituted a clear invocation of the right to remain silent. Garcia understood Cuervo's response as an election not to talk to the officers and clearly conveyed that understanding to Palmieri. Courts have concluded that similar responses constituted an exercise of the right under Miranda to terminate the interrogation. See Mosley, 423 U.S. at 104, 96 S.Ct. 321 (stating that officers "fully respected" defendant's right to cut off questioning when he stated that he did not want to discuss robberies with which he had been charged); Moore v. State, 798 So.2d 50, 52 (Fla. 1st DCA 2001) (treating suspect's indication to police after receiving Miranda warnings that he did not wish to speak as invocation of right to silence); Dooley, 743 So.2d at 68 (concluding that defendant's statement that he did not wish to waive his rights "certainly qualifies as an indication that he did not want to be interrogated"); Segarra v. State, 596 So.2d 740, 741 n. 1 (Fla. 2d DCA 1992) (concluding that in stating that he did not want to talk about a particular robbery until his lawyer was present, the defendant "was seeking the protection guaranteed by Article I, Section 9, and the Fifth Amendment").
We disagree with the Fifth District's characterization of Cuervo's response as "sufficiently uncertain to allow clarifying questions." Cuervo, 929 So.2d at 642. The Fifth District's reliance on Owen as containing analogous statements is misplaced. In Almeida, we clarified that the defendant's statements in Owen, "I don't want to talk about it" and "I'd rather not talk about it," were equivocal in that they could have been referring to specific questions about the crime or to the underlying right to cut off all questioning. 737 So.2d at 523 (citing Owen, 696 So.2d at 719).[8] The statements in Owen were made during the course of an interrogation and not given in response to a specific question regarding whether the defendant wanted to give a statement or talk after he was read his Miranda rights.
In this case, Cuervo's invocation of his right to remain silent came solely in response to the inquiry concerning his Miranda rights, before any questions specific to the crime were asked. In the context in which he stated, "No quiero declarar nada," he could only have been exercising his right under Miranda and Traylor to terminate questioning. Indeed, Garcia's next statement to Palmieri"He does not wish to talk with us"clearly conveys this understanding.
*164 At that point, the police officer's obligation was clear: to immediately cease questioning and scrupulously honor Cuervo's exercise of his right to remain silent. It is uncontested that at the officers' request, Cuervo initialed each line and signed the Miranda form after he invoked his rights and before the officers continued with the follow-up questions. The rights were read to him in Spanish, he said he understood them, he was given the opportunity to read them himself in Spanish, and he signed the form confirming that he understood.
Palmieri testified during the suppression hearing that she asked the follow-up questions because Cuervo had not signed the rights form. She stated that until he signed the form, "as far as I[was] concerned, he didn't understand it." However, by that point, he had already verbally asserted his right to remain silent without conveying any misunderstanding about the right he was exercising. Thus, Palmieri's stated concern that Cuervo did not understand a right he had already exercised was not supported by the audiotape or the transcript of the interrogation.
Accordingly, we conclude that Cuervo clearly asserted his right to remain silent when he told the officers, "No quiero declarar nada," and clearly confirmed his understanding of the right he was exercising when he initialed and signed the Spanish-language Miranda form. No further questioning should have ensued.

B. Police Response to Invocation
After a suspect invokes his or her Miranda rights, police officers are prohibited from engaging in words or actions that the officers "should know are reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301, 100 S.Ct. 1682 (footnote omitted). The prohibition on further questioning applies not only when the defendant requests counsel, but also when the defendant exercises his or her right to remain silent. See Traylor, 596 So.2d at 966.[9]
In this case, the officers engaged in conduct they could reasonably anticipate would elicit an incriminating response. After Cuervo invoked his right to remain silent and signed the rights form, Palmieri instructed Garcia to tell Cuervo that he could give "his side of the story." Garcia then told Cuervo, "[N]ow would be your opportunity if you wish to speak and explain your side of your story, your version of what happened."* Garcia added that although Cuervo was not obligated to talk, *165 if he wished to talk "there's still time."* These remarks undermined the warning to Cuervo that anything he said could be used against him in a court of law. In addition, the officer's statement created the impression that, despite his expressed desire not to talk, Cuervo had a brief window in which to vindicate himself. Cuervo again declined to talk, but significantly, he felt compelled to provide an explanation for foregoing this "opportunity" to tell his "side of the story."
Although the Fifth District characterized Cuervo's response as "an odd narrative," Cuervo, 929 So.2d at 642, Garcia clearly understood it to be a renewed indication that he wished to remain silent. Garcia told Palmieri that Cuervo "does not wish to speak because he doesn't know if the victim already said anything or the victim's mother `cause he's afraid that they've been here for thirty years or more and that they can use anything against him." In fact, both Palmieri and Garcia admitted during the suppression hearing that Cuervo said, "No, two times."
Even after Garcia told Palmieri a second time that Cuervo did not want to talk, Palmieri persisted. Palmieri told Garcia to ask Cuervo, "Does he have an attorney that we can speak with," to which Cuervo replied, "I don't have a lawyer. I don't know anyone in this country."* This additional questioning was unaccompanied by a reaffirmation of Cuervo's right to have an attorney present and have an attorney appointed before any questioning if he could not afford one. As with the advice that "now" was his time to tell his side of the story, this exchange may have confused Cuervo about the meaning of his Miranda rights, specifically the right to appointed counsel before questioning. Ultimately, when asked yet again whether he wanted to talk or answer questions, Cuervo relented. The persistence in asking Cuervo whether he wished to talk, unaccompanied by a reiteration of his Miranda rights, was reasonably designed to elicit a waiver of those rights and an incriminating response.
In Dooley, the Fourth District ruled inadmissible a confession elicited under analogous circumstances. After explaining to Dooley his rights and confirming that he understood those rights, an officer asked, "Do you wish to waive your rights and speak to me without the presence of an attorney?" Dooley, 743 So.2d at 67. Dooley stated that he did not wish to waive his rights, but the officer told him that in waiving his rights at that point, he would not be waiving them in the future. Dooley then waived his rights and confessed. Id. In reversing the resulting conviction of sexual battery, the Fourth District stated that the officer's remark "indicated that the defendant could speak with the officer without risk, that his later invocation of rights would prevent the statement from being used in court. The police may not use misinformation about Miranda rights to nudge a hesitant suspect into initially waiving those rights and speaking with the police." Id. at 69. As in Dooley, the officers in this case failed to scrupulously honor Cuervo's decision to remain silent and persisted in questioning him in a manner that nudged him into waiving his Miranda rights.
We have noted that "the requirement of giving Miranda warnings before custodial interrogation is a prophylactic rule intended to ensure that the uninformed or uneducated in our society know they are guaranteed the rights encompassed in the warnings." Davis v. State, 698 So.2d 1182, 1189 (Fla.1997). In this case, police negated the Miranda prophylaxis by continuing to seek a statement from Cuervo after he invoked his right to silence, and by doing *166 so in a manner that could have misled him regarding his rights.
Because police continued to question Cuervo after he invoked his right to silence, precedent from the United States Supreme Court and this Court on the admissibility of a confession after questioning is discontinued and then resumed is inapplicable. The United States Supreme Court decision in Mosley involved a second round of questioning commenced several hours after police had honored the defendant's decision to cut off questioning about a different crime. In ruling the confession during the second interrogation admissible, the Court specified that "[t]his is not a case . . . where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." Mosley, 423 U.S. at 105-06, 96 S.Ct. 321. In Globe v. State, 877 So.2d 663 (Fla.2004), we relied on Mosley in approving the admission of a confession obtained during questioning commenced approximately seven hours after police discontinued an earlier interrogation in response to the defendant's invocation of his right to silence. Id. at 670. Following Mosley, we considered the length of time between the first and second interrogations, whether the questioning took place in different locations, whether fresh Miranda warnings were given, and whether the second interrogation concerned a different crime. Id. (citing Mosley, 423 U.S. at 105-06, 96 S.Ct. 321).
Neither Mosley nor Globe support admission of Cuervo's confession. Unlike those cases, police failed to honor Cuervo's decision to cut off questioning and instead asked additional questions concerning his willingness to talk. In Mosley, the Court explained the rationale for its requirement that police "scrupulously honor" the invocation of the right to remain silent:
Through the exercise of his option to terminate questioning [the suspect] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting.
423 U.S. at 103-04, 96 S.Ct. 321. Further, the Court in Mosley rejected a literal interpretation of Miranda that would "require only the immediate cessation of questioning and . . . permit a resumption of interrogation after a momentary respite," concluding that such a rule "would lead to absurd and unintended results." Id. at 102, 96 S.Ct. 321. In this case, officers did not provide even the "momentary respite" contemplated in Mosley after he invoked his right to remain silent.[10]
This conclusion compels the suppression of Cuervo's confession from the State's case-in-chief, despite the absence of actual coercion. The Fifth District's opinion indicates that during "the entire exchange, there was manifestly no coercion of any sort," pointing to the brief duration of the *167 interrogation. Cuervo, 929 So.2d at 642. However, when a statement is obtained in violation of the prophylactic rule of Miranda, further inquiry into whether the statement was voluntary and free from improper coercion is unnecessary. This is clear from Miranda itself, in which the Court reviewed four different cases:
In these cases, we might not find the defendants' statements to have been involuntary in traditional terms. Our concern for adequate safeguards to protect precious Fifth Amendment rights is, of course, not lessened in the slightest. . . . To be sure, the records do not evince overt physical coercion or patent psychological ploys. The fact remains that in none of these cases did the officers undertake to afford appropriate safeguards at the outset of the interrogation to insure that the statements were truly the product of free choice.
Miranda, 384 U.S. at 457, 86 S.Ct. 1602. Thus, the State "must not be allowed to build its case against a criminal defendant with evidence acquired in contravention of constitutional guarantees and their corresponding judicially created protections," Michigan v. Harvey, 494 U.S. 344, 351, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990), such as the "prophylactic Miranda rules." Id. at 350, 110 S.Ct. 1176. It is the violation of Miranda and its progeny that requires the suppression of the statements, independent of whether the statements were coerced or "involuntary in traditional terms" under the Fifth Amendment.
Accordingly, the officers in this case violated Cuervo's right to remain silent, requiring suppression of the statements he then made in response to custodial questioning.

C. Reversible Error
To justify affirmance of a conviction despite error at trial, the State must prove beyond a reasonable doubt that the error "did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). The harmless error test is
not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable possibility that the error affected the verdict. The burden to show the error was harmless must remain on the state. If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.
Id. at 1139.
Under the facts of this case, the trial court's failure to suppress Cuervo's confession was not harmless. The confrontation resulting in the attempted murder and burglary charges took place in the victim's car, with no other witnesses present. Even though Cuervo knew the victim for several months and was living in her garage at the time of the incident, the State produced no forensic evidence connecting Cuervo to the crime and no additional pretrial confession. Moreover, although Cuervo relied on statements in his confession concerning his mental state to challenge the element of premeditation for attempted first-degree murder, the defense might have pursued a different theory of defense had the trial court granted its motion to suppress his confession.

*168 IV. CONCLUSION
For the reasons we have stated, we conclude that the trial court committed reversible error in denying the motion to suppress Cuervo's confession, which was elicited in disregard of his invocation of the right to remain silent guaranteed by the Fifth Amendment to the United States Constitution and article I, section 9 of the Florida Constitution. We therefore quash the Fifth District's decision affirming Cuervo's convictions and remand with directions to grant Cuervo a new trial in which the confession is excluded. We reiterate that Owen concerned equivocal requests to terminate questioning after a valid waiver of Miranda rights and that the defendant's statements in Owen were equivocal because they were made during the course of an interrogation and therefore could have been referring either to specific questions about the crime or to the right to terminate questioning. In addition, we reaffirm our statement in Traylor that "[i]f [a] suspect indicates in any manner that he or she does not want to be interrogated, interrogation must . . . immediately stop," 596 So.2d at 966, and approve the Fourth District's holding in Dooley that once a suspect has invoked the right against self-incrimination, a potentially misleading elaboration of the right by police renders a resulting waiver invalid.
It is so ordered.
LEWIS, C.J., and ANSTEAD and QUINCE, JJ., concur.
BELL, J., dissents with an opinion, in which WELLS and CANTERO, JJ., concur.
BELL, J., dissenting.
I disagree with the majority's conclusion. In my view, the trial court correctly denied Cuervo's motion to suppress his confession because law enforcement conducted a proper noncoercive interrogation in compliance with Miranda.[11] The majority's holding that once a defendant invokes his right to remain silent all questioning must cease constitutes a departure from the federal standard which Florida courts have followed until now. See Edwards v. Arizona, 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ("In Michigan v. Mosley, 423 U.S. 96[, 104 n. 10, 96 S.Ct. 321, 46 L.Ed.2d 313] (1975), the Court noted that Miranda had distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and had required that interrogation cease until an attorney was present only if the individual stated that he wanted counsel." (emphasis added)); see also Globe v. State, 877 So.2d 663, 670 (Fla.2004) (applying Mosley); Henry v. State, 574 So.2d 66, 69 (Fla.1991) (same).
First, in Part I, I explain that this Court should discharge jurisdiction because the decision below does not expressly and directly conflict with State v. Owen, 696 So.2d 715 (Fla.1997), Traylor v. State, 596 So.2d 957 (Fla.1992), or Dooley v. State, 743 So.2d 65 (Fla. 4th DCA 1999). In Part II, I show that the clearly erroneous standard applies to the trial court's factual finding regarding the proper translation of Cuervo's statement purportedly invoking his right to remain silent. Because this factual finding was not clearly erroneous, this Court should defer to the trial court's translation. Next, in Part III, I demonstrate that Cuervo's statement did not trigger any procedural safeguards because he did not unequivocally invoke his right to remain silent under either the majority's or the trial court's translation. In Part IV, *169 I describe how, even if Cuervo unequivocally invoked his right to remain silent, this right was scrupulously honored by law enforcement officers. Then, in Part V, I explain that, even if law enforcement officers violated Cuervo's right to remain silent, the trial court's denial of Cuervo's motion to suppress his confession was harmless error. Lastly, in Part VI, I conclude that this Court should approve the decision of the Fifth District.

I. Jurisdiction
This Court should discharge jurisdiction because the decision below does not expressly and directly conflict with the cases the majority cites. First, this is a case of first impression. The facts are unique in that Cuervo did not speak English and his Miranda rights were given through a translator and a form printed in Spanish. Surprisingly, this appears to be the first such case in Florida.
Second, the Fifth District's opinion in the instant case is consistent with our decision in Owen because in both cases, the statements were deemed equivocal. In Owen, although we did not explicitly explain our conclusion, we held that Owen's two statements to interrogating officers were equivocal. Initially, when asked whether he deliberately targeted the victim's house, Owen responded, "I'd rather not talk about it." Owen, 696 So.2d at 717 n. 4. Later, when the officer asked him where he had put a bicycle, Owen said, "I don't want to talk about it." Id. Likewise, the Fifth District concluded that Cuervo's statements were equivocal. See Cuervo, 929 So.2d at 642. Therefore, no conflict appears on the face of the Owen and Cuervo opinions.
Our later discussion of Owen in Almeida v. State, 737 So.2d 520, 523 (Fla.1999), does not create express and direct conflict. In Almeida, we explained that the statements in Owen were equivocal because "[i]n both statements it was unclear whether Owen was referring to the immediate topic of discussion, i.e., the house and the bicycle, or to the underlying right to cut off questioning." In other words, because Owen's statements were open to multiple interpretations, they were ambiguous or equivocal. See Black's Law Dictionary 581 (8th ed.2004) (defining an "equivocal" statement as one that is capable of "[h]aving more than one meaning or sense" or is "ambiguous."). As explained below in Part III, Cuervo's statements were likewise subject to multiple interpretations. Therefore, Almeida's explanation of Owen is consistent with Cuervo.
Third, Traylor v. State, 596 So.2d 957 (Fla.1992), does not conflict with the decision below because the words "indicates in any manner" in Traylor did not create a stricter standard under the Florida Constitution than under the Fifth Amendment. As this Court explained in Owen:

Owen cites Traylor v. State, 596 So.2d 957 (Fla.1992) in support of the argument that article I, section 9 provides an independent basis for requiring police to clarify a suspect's equivocal request to terminate questioning. He relies specifically upon our statement in Traylor that "[u]nder Section 9, if the suspect indicates in any manner that he or she does not want to be interrogated, interrogation must not begin or, if it has already begun, must immediately stop." Id. at 966 (emphasis added). In so doing, he reads a meaning into these words that we never attributed to them. In Traylor, we reaffirmed the federalist principles which give primacy to our state constitution and pointed out that the federal constitution represents the floor for basic freedoms while our constitution represents the ceiling. Id. at 962. Though our analysis in Traylor was grounded in the Florida Constitution, *170 our conclusions were no different than those set forth in prior holdings of the United States Supreme Court. The words "indicates in any manner" added nothing to federal law, as they were identical to the words used in Miranda itself. Miranda, 384 U.S. at 473, 86 S.Ct. at 1627. Moreover, we did not construe these words in Traylor or discuss the appropriate police response to an equivocal request because the defendant in Traylor made no request whatsoever that he wished to invoke his Miranda rights. Traylor, 596 So.2d at 971. The words "in any manner" simply mean that there are no magic words that a suspect must use in order to invoke his or her rights.
Therefore, Traylor does not control our decision in this case.
Owen, 696 So.2d at 719. Like Traylor, Cuervo made no statement whatsoever indicating that he wished to invoke his Miranda rights. Accordingly, Cuervo is consistent with Traylor.
Fourth, the majority incorrectly concludes that Dooley v. State, 743 So.2d 65 (Fla. 4th DCA 1999), conflicts with the decision below. In Dooley, the defendant contended that his statements to Detective Sanchez should have been suppressed. Prior to questioning, Sanchez properly advised Dooley of his Miranda rights, and Dooley responded affirmatively when asked whether he understood each right. After reading the Miranda warnings, Sanchez asked Dooley, "Do you wish to waive your rights and speak to me without the presence of an attorney?" Dooley responded, "Um, I don't wish to waive my rights." Then Sanchez stated, "By waiving your rights now doesn't mean that you waive them in the future. All you're saying here now is that you're talking to me without the presence of an attorney. If one is required later on, if that's your wish, one can be appointed to you. Do you understand that?" Dooley then replied, "Um, I'm going to talk to you." Id. at 67. The interview continued, and Dooley confessed. At the suppression hearing, the trial court listened to the tape recording of the interrogation and concluded that Dooley spontaneously and voluntarily waived his Miranda rights. On appeal, the Fourth District reversed, concluding that Sanchez was required to cease questioning when Dooley asserted his rights by saying, "Um, I don't wish to waive my rights." The Fourth District held that Sanchez's response to this assertion was an improper attempt to "use misinformation about Miranda rights to nudge a hesitant suspect into initially waiving those rights and speaking with the police." Id. at 69.
Unlike Cuervo, Dooley invoked all of his Miranda rights, including his right to counsel, when he said, "Um, I don't wish to waive my rights," thereby triggering the enhanced procedural safeguards that apply to invocations of the right to counsel. See Edwards. Cuervo, on the other hand, did not invoke his right to counsel. As explained in Part IV below, even assuming Cuervo unequivocally invoked his right to remain silent, his case must be analyzed under a totality of the circumstances test. Federal and Florida precedent does not require immediate cessation of questioning for invocations of the right to remain silent. See Mosley; Globe; Henry. Further, the officers did not use misinformation about Cuervo's rights to nudge him into speaking with them. Therefore, the district court opinions in Dooley and Cuervo do not expressly and directly conflict with each other.
Because the decision below does not conflict with Owen, Traylor, or Dooley, this Court does not have jurisdiction and this case should be discharged.

*171 II. Standard of Review
This Court has held that
appellate courts should continue to accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution.
Globe, 877 So.2d at 668-69 (quoting Nelson v. State, 850 So.2d 514, 521 (Fla.2003)). Further,
"Suppression issues are extraordinarily rich in diversity and run the gamut from (1) pure questions of fact, to (2) mixed questions of law and fact, to (3) pure questions of law." . . . Appellate courts cannot use their review powers in such cases as a mechanism for reevaluating conflicting testimony and exerting covert control over the factual findings. As with all trial court rulings, a suppression ruling comes to the reviewing court clad in a presumption of correctness as to all fact-based issues, and the proper standard of review depends on the nature of the ruling in each case.
State v. Glatzmayer, 789 So.2d 297, 301 (Fla.2001) (footnotes omitted).
In the instant case, the trial court made a factual determination regarding the correct translation of Cuervo's statement in which he purportedly invoked his right to remain silent. The court's determination was based not only on the transcript of the interrogation and the tape recording but also on the live testimony of Deputy Garcia and the court interpreter. Therefore, deference should be given to this factual finding. The factual dispute at the suppression hearing was whether Cuervo said, "I don't want anything" or "I don't want to declare anything," in response to Deputy Garcia's question, "Do you desire to discuss the pending matter and/or to make a declaration?" On the one hand, the transcript of the interrogation translated the exchange from Spanish to English as follows:
Garcia: Okay. Do you wish to talk about the matter and make a statement, yes or no? You have to talk loudly please for the recording?*
Cuervo: No, no I don't want, not now.*
Garcia: You don't want to say anything, okay.* Um, he does not wish to talk with us.
However, the prosecution played the tape recording of the interrogation during Deputy Garcia's testimony at the suppression hearing to confirm the accuracy of the transcript. The first time the tape was played, Deputy Garcia testified that the transcript was in error in that Cuervo said only, "No I don't want," and did not say "not now." The State moved for a court-ordered transcript of the interrogation. The trial judge asked defense counsel whether he heard the words "not now." Defense counsel stated that he thought the words were said but requested that the court interpreter be permitted to listen to the pertinent segment of the recording and translate Cuervo's response for the court. The trial judge agreed and directed the attorneys, Deputy Garcia, and the court interpreter to listen to the segment again to see if all would agree on an interpretation. After this segment was played again, Deputy Garcia testified that Cuervo said, "`No quiero declarar nada,' which means, I don't want to declare anything." The State insisted that the court interpreter provide a translation, and the segment was played again. The court interpreter translated Cuervo's response as, "No, I don't want anything." Based on the court interpreter's *172 translation, Deputy Garcia conceded that he had paraphrased what Cuervo said. Therefore, considering the tape recording as well as the testimony of both Deputy Garcia and the court interpreter, the trial court made a factual finding that Cuervo said, "No, I don't want anything." Later, the trial court denied Cuervo's motion to suppress, ruling that this statement was ambiguous.
Notwithstanding the trial court's finding of fact, on appeal, the Fifth District translated Cuervo's response as, "No, I do not want to declare anything. I justI do not want to declare anything." Cuervo v. State, 929 So.2d 640, 641 (Fla. 5th DCA 2006). And the majority now translates Cuervo's statement as "I don't want to declare anything." Majority op. at 157.
An independent review of the tape recording seems to reveal the following dialogue:
Deputy Garcia: Okay. Do you desire to discuss the pending matter and/or to make a declaration? Yes or no? You have to talk loudly please for the recording.
Cuervo: No quiere declarar nada. [I don't want to declare anything.]
Deputy Garcia: No quiere nada. [You don't want anything.] Um, he does not wish to talk with us.
However, the trial court's factual finding is certainly plausible, particularly in light of the fact that it was based in part on the testimony of Deputy Garcia and the court interpreter. This Court does not have the benefit of Deputy Garcia's or the court interpreter's live testimony and, thus, cannot weigh the credibility of it. Therefore, I cannot conclude that the trial court's finding was clearly erroneous.
Having settled on a translation of Cuervo's statement, in the next two sections I apply the proper analysis for invocations of the right to remain silent. The analysis consists of two separate inquiries: (1) whether the defendant unequivocally invoked his right to remain silent, see Owen, 696 So.2d at 717-18; and (2) if so, whether, under the totality of the circumstances, law enforcement officers scrupulously honored it, see Globe, 877 So.2d at 670. I address the first inquiry in Part III and the second in Part IV.

III. Cuervo Did Not Unequivocally Invoke His Right to Remain Silent
The first step in evaluating whether law enforcement officers violated Cuervo's right to remain silent is to objectively consider what Cuervo said and determine whether it constitutes an unequivocal invocation of that right. A suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis, 512 U.S. at 459, 114 S.Ct. 2350 (emphasis added); see also Owen, 696 So.2d at 718 ("Davis applies as much to requests to terminate interrogation as it does to requests for counsel."). As I explain below, Cuervo's statement was ambiguous under both the trial court's and the majority's translation.
The following circumstances preceded Cuervo's statement. Cuervo spoke no English, only Spanish. Detective Palmieri, the lead detective on the case, did not speak Spanish. Therefore, she asked Deputy Garcia to read Cuervo a Miranda rights form printed in Spanish and to have Cuervo initial next to each right signifying that he understood it. Deputy Garcia explained to Cuervo in Spanish that he was going to read his rights. Then, Deputy Garcia read each right to Cuervo and asked if he understood. Cuervo indicated that he did. In reading line six of the Miranda form, Garcia asked Cuervo, "Do *173 you wish to talk about the matter and make a statement, yes or no?" According to the trial court's translation, Cuervo replied, "I don't want anything." At the time Cuervo made this statement, he had not initialed or signed the Miranda form.
First, Cuervo's statement, "I don't want anything," is ambiguous. The answer did not respond to Deputy Garcia's question, "Do you wish to talk about the matter and make a statement, yes or no?" It evinces no intent on the part of Cuervo to refuse to make a statement or to discuss the matter. However, the statement could indicate that Cuervo misunderstood the question, in which case clarification questions such as those asked by Detective Palmieri and Deputy Garcia would be appropriate, although not required. See Davis, 512 U.S. at 461, 114 S.Ct. 2350 ("Clarifying questions help protect the rights of the suspect . . . [b]ut we decline to adopt a rule requiring officers to ask clarifying questions."). As the State contends, the language barrier and the unsigned Miranda form created ambiguity as to whether Cuervo actually understood and invoked his right to cut off questioning. Therefore, a reasonable officer would not consider Cuervo's statement to be an unequivocal invocation of the right to remain silent.
Furthermore, the cases cited by the majority do not support its conclusion that Cuervo's statement, as translated by the trial court, was an unequivocal invocation of his right to remain silent. First, in Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Supreme Court found that Mosley unequivocally invoked his right to remain silent when he specifically "said he did not want to answer any questions about the robberies." Id. at 97, 96 S.Ct. 321 (emphasis added). Mosley's response was much more specific than Cuervo's statement that he did not want anything, because it actually expressed intent to cut off questioning about the crime. Second, in Moore v. State, 798 So.2d 50, 52 (Fla. 1st DCA 2001), the issue of whether Moore unequivocally invoked his right to remain silent was not presented. The First District stated in the facts section of its opinion that Moore "indicated to police that he did not wish to speak," and that he "invok[ed] this right." Id. By contrast, Cuervo never unequivocally stated that he did not wish to speak to the officers. Third, in Dooley, 743 So.2d at 68, the Fourth District held that "Dooley's statement: `Um, I don't wish to waive my rights' certainly qualifies as an indication that he did not want to be interrogated." Id. Dooley's statement invoking both his right to remain silent and his right to counsel is far less equivocal than Cuervo's statement, because it specifically refers to his desire to utilize his rights. Finally, in Segarra v. State, 596 So.2d 740 (Fla. 2d DCA 1992), the Second District held that Segarra's statement, "I don't want to talk until my lawyer is present," was an invocation of his "right to remain silent pending consultation with an attorney." Id. at 741 & n. 1. Segarra's statement directly verbalized his desire not to talk and to have counsel present. Thus, it was far less equivocal than Cuervo's statement.
Moreover, under either the trial court's translation ("I don't want anything") or the majority's translation ("I don't want to declare anything"), Cuervo's statements are no less equivocal than Owen's statements. See Owen, 696 So.2d at 720. First, when asked whether he deliberately targeted the victim's house, Owen responded, "I'd rather not talk about it." Second, when the officer later asked him where he had put a bicycle, Owen said, "I don't want to talk about it." This Court held without explanation that "Owen's responses were equivocal." Id. at 717 n. 2. However, as the majority points out, later in Almeida v. *174 State, 737 So.2d 520, 523 (Fla.1999), this Court explained that the statements in Owen were equivocal because "[i]n both statements it was unclear whether Owen was referring to the immediate topic of discussion, i.e., the house and the bicycle, or to the underlying right to cut off questioning." In other words, because Owen's statements were open to multiple interpretations, they were ambiguous or equivocal. See Black's Law Dictionary 581 (8th ed.2004) (defining an "equivocal" statement as one that is capable of "[h]aving more than one meaning or sense" or is "ambiguous").
The majority's translation, "I don't want to declare anything," is likewise ambiguous. The majority conclusorily holds that in stating, "No quiero declarar nada" ("I don't want to declare anything"), Cuervo "could only have been exercising his right under Miranda and Traylor to terminate questioning." Majority op. at 163 (emphasis added). However, Cuervo made this statement in response to Deputy Garcia's compound question: "Desea discutir el asunto pendiente y/o hacer alguna declaracion? Si o no?," which translates to "Do you desire to discuss the pending matter and/or to make a declaration? Yes or no?" While Cuervo's response objectively indicated that he did not want to make any formal declarations, he did not altogether refuse to discuss the matter. Because Cuervo's statement, "No quiero declarar nada," is capable of having more than one meaning, it cannot be characterized as an unequivocal invocation of his right to remain silent.

IV. Law Enforcement Officers Scrupulously Honored Cuervo's Right to Remain Silent
Even assuming arguendo that Cuervo unequivocally invoked his right to remain silent, the totality of the circumstances indicates that law enforcement officers scrupulously honored it. Until now, Florida courts have followed the federal rule, which does not require immediate cessation of questioning when a suspect unequivocally invokes his right to remain silent. See Globe, 877 So.2d at 670 ("[T]he [United States] Supreme Court neither set out `precise guidelines' for what constitutes scrupulous adherence to Miranda nor stated that `any factor standing by itself would be dispositive of the issue.'" (quoting Henry, 574 So.2d at 69)); cf. Owen, 696 So.2d at 720 ("Florida's Constitution does not place greater restrictions on law enforcement than those mandated under federal law when a suspect makes an equivocal statement regarding the right to remain silent. . . ."). The United States Supreme Court applies a rigid prophylactic rule requiring immediate cessation of interrogation only when a suspect unequivocally invokes his right to counsel. See Smith v. Illinois, 469 U.S. 91, 94-95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (citing Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880; Fare v. Michael C., 442 U.S. 707, 719, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).[12] However, when a suspect invokes his right to remain silent, the Supreme Court applies a less stringent totality-of-the-circumstances test. See Mosley, 423 U.S. at 104, 96 S.Ct. 321. "In Michigan v. Mosley, the [Supreme] Court noted that Miranda had distinguished between *175 the procedural safeguards triggered by a request to remain silent and a request for an attorney and had required that interrogation cease until an attorney was present only if the individual stated that he wanted counsel." Edwards, 451 U.S. at 485, 101 S.Ct. 1880 (citation omitted) (emphasis added). On the other hand, Mosley held that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his `right to cut off questioning' was `scrupulously honored.'" Mosley, 423 U.S. at 104, 96 S.Ct. 321.
In Globe, this Court applied the holding of Mosley, explaining that "the Supreme Court neither set out `precise guidelines' for what constitutes scrupulous adherence to Miranda nor stated that `any factor standing by itself would be dispositive of the issue.'" Globe, 877 So.2d at 670 (quoting Henry, 574 So.2d at 69). The Globe Court identified five factors which are particularly relevant in determining whether law enforcement officers scrupulously honored the suspect's right to remain silent: (1) the suspect was informed of his rights before each round of questioning; (2) the officer immediately ceased questioning after the suspect unequivocally refused to talk; (3) there was a significant lapse of time between rounds of questioning; (4) the second episode of questioning took place in a different location; and (5) the second episode involved a different crime. However, the Globe Court noted that "[i]n Henry, we determined that variance as to one or more of the five factors was not dispositive, and therefore applied a totality of the circumstance approach. We apply the same analysis in this case." Id. (emphasis added). Even prior to Globe, this Court recognized that "requests for counsel have been accorded greater judicial deference than requests to terminate interrogation." Owen, 696 So.2d at 718 n. 6 (citing State v. Williams, 535 N.W.2d 277, 285 (Minn.1995) (citing Mosley, 423 U.S. at 104 n. 10, 96 S.Ct. 321 (distinguishing between the procedural safeguards triggered by a request to remain silent and the greater procedural safeguards triggered by a request for an attorney))). Thus, according to our precedent, questioning need not always cease when the defendant unequivocally invokes his right to remain silent. The fact that interrogation ceased after the defendant invoked his right to remain silent is but one factor to consider in evaluating the totality of the circumstances.
Under the Globe test, Cuervo's right to remain silent was scrupulously honored. First, Deputy Garcia read Cuervo his Miranda rights one at a time, and Cuervo affirmed that he understood each right. Cuervo also received and initialed a Spanish language Miranda form, indicating that he was informed of and understood his rights. The officers reminded Cuervo several times throughout the interrogation that he did not have to talk to them if he did not want to. Second, the officers inquired as to whether Cuervo had an attorney with whom they could speak. Third, the officers asked only clarification and no substantive questions until Cuervo agreed to talk to them about the crime. Fourth, the duration of the preliminary exchange was only about two minutes, and the entire interrogation lasted only about one-half of an hour. Fifth, it is clear from the recording that the officers made no threats, promises, or attempts to deceive Cuervo into incriminating himself.[13] Cuervo freely *176 and voluntarily chose to make incriminating statements after he was informed of his rights. "The purpose of Miranda was to prevent `repeated rounds of questioning to undermine the will of the person being questioned.'" Henry, 574 So.2d at 70 (quoting Mosley, 423 U.S. at 102, 96 S.Ct. 321). Sixth, the officers did not use fear, intimidation, or psychological tactics and did not deprive Cuervo of food, water, or sleep in order to induce his confession. Under these circumstances, the "need for effective law enforcement" outweighs the dangers Miranda sought to avoid. Davis, 512 U.S. at 461, 114 S.Ct. 2350.
Most importantly, the officers never "interrogated" Cuervo until he agreed to answer questions. Simple clarification questions seeking to ensure that a suspect understands his rights do not fall within the definition of "interrogation." See Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ("[T]he term `interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."). The majority takes issue with Deputy Garcia's statement to Cuervo: "[N]ow would be your opportunity if you wish to speak and explain your side of the story, your version of what happened." The majority claims that this remark "undermined the warning to Cuervo that anything he said could be used against him in a court of law." Majority op. at 165. This general reference to Cuervo's decision to speak did not invite Cuervo to incriminate himself. The officers did not suggest that his statements to them would be kept confidential, and Cuervo had no reasonable expectation that they would. "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." Davis, 512 U.S. at 460, 114 S.Ct. 2350 (quoting Moran v. Burbine, 475 U.S. 412, 427, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). Moreover, there is nothing untrue or misleading about Detective Palmieri's statement. The officers did not suggest that it was Cuervo's only chance to speak  just that it was one opportunity for him to do so. Furthermore, the unsigned Miranda form, the language barrier and ambiguity in the conversation created sufficient uncertainty as to whether Cuervo understood his rights such that a reasonable officer would deem clarification questions appropriate. By asking a reasonable number of clarification questions, the officers respected both society's interest in thorough criminal investigations and the individual's privilege against self-incrimination. See Mosley, 423 U.S. at 102, 96 S.Ct. 321 ("[A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests."). This type of police conduct exemplifies the proper balance between the need to protect the rights of the accused and society's need for effective law enforcement.
Further, Almeida is both factually and legally distinguishable. After the interrogating detective read Almeida his Miranda rights, he asked Almeida if he wished to speak without an attorney present. *177 Almeida responded, "Well, what good is an attorney going to do?" Almeida, 737 So.2d at 522. Without answering Almeida's question, the detective proceeded to ask Almeida substantive questions about the case leading to Almeida's confession. At trial, the court denied Almeida's motion to suppress his confession. On appeal, Almeida claimed that the trial court should have suppressed his confession because, by refusing to answer his question, the detective violated Almeida's Miranda rights. This Court held that Almeida's custodial utterance was "prefatory toand possibly determinative of" the invoking of his right to counsel. Id. at 523. The Court determined that Almeida was asking the officer a bona fide question concerning his right to counsel and that the officer's nondisclosure "exacerbate[d] the inherently coercive atmosphere of the interrogation session, and it place[d] in doubt the knowing and intelligent nature of any waiver whether prior or subsequent." Id. at 525. Further, the Court held that
if, at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer. To do otherwisei.e., to give an evasive answer, or to skip over the question, or to override or "steamroll" the suspectis to actively promote the very coercion that Traylor was intended to dispel. A suspect who has been ignored or overridden concerning a right will be reluctant to exercise that right freely. Once the officer properly answers the question, the officer may then resume the interview (provided of course that the defendant in the meantime has not invoked his or her rights). Any statement obtained in violation of this proscription violates the Florida Constitution and cannot be used by the State.
Id.
Unlike Almeida, this case does not involve any attempt by law enforcement officers to "steamroll" over the suspect. As the tape recording reveals, the mood of the interrogation was closer to a friendly conversation in which the officers politely sought to determine whether Cuervo, in fact, desired to invoke his rights. The officers used calm tones of voice and did not attempt to deceive or mislead Cuervo in any way. Furthermore, unlike Almeida, Cuervo never asked the officers any questions concerning his rights. And, under the circumstances, Cuervo's statement was neither "prefatory to" nor "determinative of" invoking a right. See id. at 523. Nevertheless, even Almeida recognized that "no rigid set of guidelinesno matter how simple or clearwill work in every case." Id. at 526. Other than a complete ban on custodial interrogations, nothing could be more rigid than the new absolute cessation of questioning rule that the majority now creates.

V. Harmless Error
Even if an involuntary pretrial confession is erroneously admitted in evidence at trial, that error is subject to the harmless error rule. Sheffield v. State, 580 So.2d 790, 792 (Fla. 1st DCA 1991) (citing Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). "The harmless error test, as set forth in Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)] and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). *178 "Application of the test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict." Id.
Any error in admitting Cuervo's confession was harmless due to the overwhelming evidence of guilt against Cuervo. The surviving victim knew Cuervo for several months before the incident and described Cuervo's actions in detail. Cuervo had been living in the victim's garage at the time, and the victim had previously rejected romantic advances by Cuervo. In addition, other witnesses and physical evidence corroborated her description of the crime. Thus, to acquit Cuervo the jury would have to overcome unimpeached and corroborated testimony that Cuervo in fact stabbed the victim. None of the facts revealed in Cuervo's confession established elements of the crime that were not already established by the victim's testimony. Because the victim's testimony was unimpeached and corroborated, it is not reasonably possible that the jury would find the victim's testimony noncredible. Thus, due to the overwhelming evidence of guilt against Cuervo, there is no reasonable possibility that Cuervo's confession influenced the jury's verdict.

VI. Conclusion
For the foregoing reasons, I cannot agree with the majority's conclusion that Cuervo's right to remain silent was violated. I would approve the Fifth District's decision affirming Cuervo's convictions.
WELLS and CANTERO, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Statements with asterisks are translated from Spanish to English.
[3] "No person . . . shall be compelled in any criminal case to be a witness against him-self." U.S. Const. amend. V.
[4] Prior to Owen, this Court required law enforcement officers to clarify equivocal statements made in the course of interrogation regarding Miranda rights. See Long v. State, 517 So.2d 664, 667 (Fla.1987).
[5] Apparently, the interpreter simply did not hear or omitted an English translation of the word "declarar."
[6] If Cuervo had actually stated in Spanish "I don't want anything," or if the officer had understood that to be Cuervo's response, this would be a closer case on whether the response was equivocal and whether the officers were justified in asking further clarifying questions to determine if Cuervo intended to invoke his right to remain silent. However, these are not the facts of this case.
[7] Although the trial judge concluded that the translation given by the interpreter at the time of the hearing governed, the question of whether Cuervo's response was equivocal is an objective one based on the circumstances that existed at the time of interrogation and not an after-the-fact justification for continued interrogation.
[8] Further, as we have noted, Owen concerns equivocal requests to terminate questioning after a valid waiver of Miranda rights, which is not the case here.
[9] The dissent concludes that our decision departs from Florida law, and the federal standard on which it is based, on the issue of whether police questioning must immediately cease upon the invocation of the right to remain silent. Justice Bell asserts that our decision in Globe v. State, 877 So.2d 663 (Fla.2004), and the United States Supreme Court's decisions in Mosley and Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), stand for the proposition that interrogation must immediately cease only if the right to counsel, as opposed to the right to silence, has been invoked. See dissenting op. at 175. However, as discussed in more detail below, it is only when police attempt to reinitiate questioning after a defendant invokes his or her rights under the Fifth Amendment to the United Statutes Constitution and article I, section 9 of the Florida Constitution that a distinction between the right to remain silent and the right to counsel becomes relevant. As we explained in Traylor, and reiterated in Globe, "if the suspect indicates in any manner that he or she does not want to be interrogated, interrogation must not begin or, if it has already begun, must immediately stop." Globe, 877 So.2d at 669 (quoting Traylor, 596 So.2d at 966); see also Mosley, 423 U.S. at 104, 96 S.Ct. 321 ("[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his `right to cut off questioning' was `scrupulously honored.'").
[10] Even if we were to apply the other factors that contributed to the determination in Mosley that the invocation of silence was scrupulously honored, we would reach the same conclusion. In addition to the passage of time, the Court in Mosley pointed to the fact that the second round of questioning was conducted by a different police officer in a different location, concerned a different crime, and was preceded by a fresh set of Miranda warnings. 423 U.S. at 104-05, 96 S.Ct. 321. In contrast, after Cuervo invoked his right to remain silent, police continued to question him at the same location concerning the same crime. Cuervo was told he did not have to answer and could stop the interview at any point, but was not given a fresh set of Miranda warnings.
[11] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[12] The Smith Court noted that "Edwards set forth a `bright-line rule' that all questioning must cease after an accused requests counsel" because, "[i]n the absence of such a bright-line prohibition, the authorities through `badger[ing]' or `overreaching'explicit or subtle, deliberate or unintentionalmight otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." 469 U.S. at 98, 105 S.Ct. 490 (citation omitted).
[13] At the end of the interview, Cuervo said:

Like you said earlier, if I didn't want to respond I wouldn't have responded, that's it. And if you guys would have threatened me . . . I'm convinced that we would have had problems in here. . . . They haven't promised me anything. . . . If you want to continue asking me questions I will keep on talking.