574 So.2d 66 (1991)
John Ruthell HENRY, Appellant,
v.
STATE of Florida, Appellee.
No. 70554.
Supreme Court of Florida.
January 3, 1991.
Rehearing Denied February 27, 1991.
*67 James Marion Moorman, Public Defender and Robert F. Moeller, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen. and Stephen A. Baker, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
John Ruthell Henry appeals from a conviction for first-degree murder and death sentence. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.

I.
A Hillsborough County jury convicted Henry of murdering Eugene Christian, the five-year-old son of his estranged wife, and he was sentenced to death. Henry later was convicted of murdering his wife by a Pasco County jury and was also sentenced to death for that crime. While the two cases are related, we have addressed the Pasco County conviction in a separate opinion. Henry v. State, 574 So.2d 73 (Fla. 1991).
Suzanne Henry's body was found in her home in the Pasco County town of Zephyrhills, Florida, at 4:20 p.m. on December 23, 1985. She had been stabbed thirteen times in the throat, and her body had been covered with a rug and left near the living room couch. Her son, five-year-old Eugene Christian, was missing.
Within a short period of time, the sheriff's office discovered enough evidence to arrest Henry for his wife's murder. The two chief investigators in the case were Pasco County detectives Fay Wilber and William McNulty. Wilber and McNulty tracked Henry to the Twilight Motel in Zephyrhills, where he was staying in a room with Rosa Mae Thomas. He was arrested shortly after midnight. Detective Wilber read Henry his "Miranda rights,"[1] and asked about Eugene Christian. Henry denied knowing his whereabouts.
*68 Henry was taken to the Pasco County Sheriff's Office in Dade City for questioning. He was placed in a conference room, the dimensions of which were approximately ten by twenty feet. One wrist was handcuffed to a chair, but he was not otherwise restrained, and he was allowed to smoke cigarettes and drink coffee. Wilber had known Henry for a number of years, so it was decided that he would question him.
While Wilber went to get coffee, however, McNulty attempted to talk to Henry, "to establish a rapport." McNulty said he understood Henry had "done some time before," to which Henry replied, "I am not saying nothing to you. Besides, you ain't read me nothing yet." McNulty reminded Henry that Wilber had read him his rights at the motel, and then asked where Eugene Christian was. After a few moments, Wilber came back with coffee, and McNulty left. On several occasions McNulty reentered the room to observe and participate in the questioning. McNulty never related Henry's statement to Wilber because he took it to mean that Henry simply did not wish to talk to him (McNulty).
Upon reentering with the coffee, Wilber read Henry his Miranda rights, and Henry agreed to talk. Wilber and Henry talked over the course of more than three hours. However, Wilber was out of the room on one occasion for perhaps as much as an hour and a half. Even then Henry did not confess. Ultimately, Wilber said he was going to have to leave and find Eugene without Henry's help. At this point, Henry said Eugene was in Plant City. Wilber asked if the boy was alive, and Henry said he was not. Henry said he would take police to the site, and he did so. When the body was found, it appeared that the victim had been stabbed five times in the neck. Once the body was recovered, Henry was taken back to Dade City, where, after again being informed of his Miranda rights, he made a full confession concerning both murders.
Henry related that he had gone to his estranged wife's house before noon on December 22 to discuss what Christmas present to buy Eugene. While he was there they got into an argument over his living with Rosa Thomas. After he refused to leave, she attacked him with a kitchen knife. They "tussled" and after he was cut three times on his left arm, he "freaked out," took the knife away from her, and stabbed her. He then covered her body and went into another room to get Eugene, who had been watching television.
Henry said that he then took Eugene with him and drove to Plant City, in Hillsborough County. They stopped for him to buy the boy a snack and later for him to buy some cocaine, before heading back toward Zephyrhills. When Henry thought he saw flashing lights behind him, he said he turned into an isolated area near a chicken farm because he believed police were after him. When the car got stuck in some mud, Henry and Eugene got out and walked a short distance away. They stopped and Henry smoked his cocaine while holding Eugene on his knee. He then stabbed the boy to death and considered killing himself, but could not bring himself to do it. He walked around for awhile before dropping the knife in a field. Some nine hours had passed since he killed his wife. He walked back to Zephyrhills, went to Rosa Thomas' house, and changed clothes. The two then went to the motel. Henry said he did not know why he killed Suzanne and Eugene.
There were two significant pretrial skirmishes. The defense unsuccessfully moved to suppress the confession and all evidence that flowed from Henry's statements. The defense also announced that it would rely on an insanity defense. The trial judge appointed two doctors to examine Henry. After examination by a psychiatrist and a psychologist, Henry was declared sane at the time of the offense. The defense hired two experts who, after examining Henry, determined that he was legally insane at the time he killed Eugene Christian. The state then moved to have its expert examine Henry, and Henry refused to be examined. Upon motion by the state, the trial court ordered Henry to submit to the examination. When Henry again refused, the trial court struck the insanity defense.
*69 The case proceeded to trial, where the jury found Henry guilty of both premeditated and felony murder (kidnapping was the underlying felony) and recommended death by a ten-to-two vote. The trial judge found four aggravating factors: (1) that Henry had previously been convicted of second-degree murder in 1976; (2) that the killing was committed in the course of a kidnapping; (3) that the killing was committed for the purpose of avoiding or preventing lawful arrest or effecting an escape from custody; and (4) that the killing was committed in a cold, calculated, and premeditated manner. In mitigation he found that Henry was under the influence of extreme mental or emotional disturbance and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.

II.
Henry argues that it was improper to admit all statements made after he told McNulty he was "saying nothing" to him. He argues that his right to cut off questioning was not scrupulously honored in accordance with the principles of Miranda.[2]
The principal decision of the United States Supreme Court which has sought to explain the meaning of "scrupulously honored" is Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). In Mosley, the Court concluded that a Michigan appellate court had misapplied Miranda when it suppressed a confession that was obtained under the following circumstances. Mosley was arrested and read his Miranda warnings, which he initially waived. When the officer asked him about some burglaries, however, he said he did not wish to discuss them. The officer ceased questioning, and Mosley was moved to a different part of the jail. Two hours later another policeman approached Mosley and read him his rights. After receiving a waiver of those rights, he asked Mosley about a homicide, and Mosley confessed.
The Court found several factors relevant in upholding this confession. First, Mosley was informed of his rights both times before questioning began. Second, the officer immediately ceased questioning when Mosley unequivocally said he did not want to talk about the burglaries. Third, there was a significant lapse of time between the questioning on the burglary and the questioning on the homicide. Fourth, the second episode of questioning took place in a different location. Fifth, the second episode involved a different crime.
Mosley does not fully resolve the issue before us because the Court only said what did constitute scrupulously honoring Miranda rather than what did not. Furthermore, the Court did not set precise guidelines and did not say whether any factor standing by itself would be dispositive of the issue. Henry argues that because McNulty continued to ask some questions after Henry said he did not want to talk to him, that fact alone means the right to cut off questioning was not scrupulously honored. To the contrary, upon consideration of the totality of the circumstances, we believe that the police did not violate the principles of Miranda or Mosley in obtaining appellant's confession.
First, the comment "I'm not saying nothing to you. Besides you ain't read me nothing yet," does not indicate that Henry wanted to cut off all questioning; in fact, it appears that it was McNulty he did not want to speak to, given that he knew Wilber better.[3] Second, it was McNulty's comments about Henry having been in prison that sparked Henry's remark and not a question about either killing. Third, the trial court fairly could have inferred from McNulty's testimony that Henry was only *70 interested in having his Miranda rights read to him, rather than being disinclined to speak. Fourth, McNulty only asked a few questions; he testified he asked about Eugene Christian "two, maybe three times," and about the automobile Henry was driving once. Significantly, there is no indication that Henry incriminated himself as a result of those questions. Finally, upon reentering after McNulty's brief bout of questioning, Wilber read Henry his rights again. Thus, even if we were to view Henry's statement as an equivocal request, Wilber's reading of the Miranda warnings was an effective, if unintentional, clarification of Henry's intent.
Furthermore, Henry did not confess until after the trip to Hillsborough County, at least six hours from the time he made his remark to Detective McNulty, and after a fresh set of Miranda warnings had been given to him. Indeed, Mosley's confession was deemed valid even though it was made only two hours after he had clearly indicated his desire to cut off questioning. The purpose of Miranda was to prevent "repeated rounds of questioning to undermine the will of the person being questioned." Mosley, 423 U.S. at 102, 96 S.Ct. at 326. There was no effort on Wilber's part to coax an unwilling suspect to speak to police. In fact, Henry showed no reluctance to speak to Wilber at all, though he did show an initial reluctance to tell him the truth. This is not a case like Long v. State, 517 So.2d 664 (Fla. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988), in which we pointed out that when an accused invokes his right to counsel, all questioning must cease and the accused is not subject to further interrogation until counsel has been provided. We hold that Henry's confession was properly admitted.

III.
Henry also argues that the striking of the insanity defense was error. He acknowledges that this Court has held that
where a defendant in a criminal case serves notice that she will rely upon a defense of insanity and the court over her objections orders her to give testimonial response to court-appointed psychiatrists under pain of forfeiting the testimony of her privately-engaged psychiatrist, the defendant's rights to freedom from self-incrimination are not invaded.
Parkin v. State, 238 So.2d 817, 822 (Fla. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1189, 28 L.Ed.2d 322 (1971). However, Henry contends that Florida Rule of Criminal Procedure 3.216 does not contemplate so severe a sanction as striking a defense. We disagree that the rule, public policy, or the constitution prevent such an action in this case. It is undisputed that parties in a civil case can require another party to submit to a medical or psychiatric examination, so long as the examination is pertinent to an issue in the suit. See Fla.R.Civ.P. 1.360. We see no reason why, as a party, the state should not have the same right. The prosecution bears the burden of proving sanity beyond a reasonable doubt. If a defendant seeks to pursue an insanity defense, the state should have an equal opportunity to obtain evidence relevant to that issue. The fact that the court-appointed doctors would testify that Henry was sane at the time of the offense did not necessarily make examination by the state's expert unnecessary. The defense's expert or experts may have much more impressive credentials than the court-appointed expert, or may have done additional examinations that the state was entitled to have done by its expert, as well. Under the circumstances of this case, we conclude that the trial judge did not abuse his discretion in striking the defense of insanity upon Henry's failure to cooperate with the psychiatrist.

IV.
We also reject the following additional guilt phase contentions:
First, the trial court did not err in admitting evidence from the Suzanne Henry murder, as it had to prove that Henry premeditated the murder of Eugene Christian and that he was kidnapping the child, rather than taking him lawfully. Furthermore, the facts of the second killing were so inextricably wound up with the first that *71 to try to separate them would have been unwieldy and likely to lead to confusion. Nickels v. State, 90 Fla. 659, 106 So. 479 (1925). Second, the prosecution was properly allowed to elicit from defense expert, Dr. Robert Berland, that ninety-eight percent of his clientele consisted of criminal defendants and that forty percent of his practice consisted of first-degree murder defendants represented by the Hillsborough County Public Defender's office. These questions were relevant to show bias, prejudice, or interest. (3) Further, we do not believe the trial judge abused his discretion in declining the jury's request to rehear the testimony of four mental health experts (estimated to last two and one-half hours). It should be noted that the judge indicated that he would permit the testimony to be received if it developed that the jury might not be able to reach a verdict. (4) Finally, we believe the evidence was sufficient to show a kidnapping of Eugene Christian, who was not Henry's son, either by birth or adoption.
OVERTON, EHRLICH and GRIMES, JJ., concur.
SHAW, C.J., concurs in part and dissents in part with opinion.
McDONALD, J., concurs in part and dissents in part with opinion.
BARKETT, J., dissents with opinion in which KOGAN, J., concurs.
SHAW, Chief Justice, concurring in part and dissenting in part.
I agree with Justice Barkett's opinion that Henry's confession should have been suppressed because the police failed to clarify his equivocal statement. However, I concur in the remainder of the majority opinion.
McDONALD, Justice, concurring in part and dissenting in part.
I conclude that under the circumstances of this case the trial judge abused his discretion in striking Henry's insanity defense.
Henry filed notice that he intended to rely upon insanity as a defense and listed a psychiatrist and a psychologist as witnesses to support the defense. The state then filed a motion requesting the appointment of additional experts to examine him. The court granted that request, and two more experts examined Henry. These experts reported him to be sane at the time of the offense and competent to stand trial.
Thereafter, the state sought and obtained an order for an additional examination by the state's doctor. Defense counsel objected and instructed Henry not to cooperate with the state's designated doctor.[4] Finding that his order requiring this examination had been disobeyed, the trial judge struck the insanity defense. At trial the defense used the first two experts in an effort to demonstrate that Henry lacked the capacity to form premeditated intent, but was not allowed to pursue the insanity defense.
I recognize that a trial judge has the authority to take reasonable steps to enforce his orders and that those punitive measures should be sustained unless the trial judge has abused his discretion. Under some circumstances it is appropriate to strike an insanity defense upon a willful refusal to be examined, but I do not believe that striking the insanity defense can be justified in this case. The state had two experts who had examined Henry pursuant to a court order available to dispute the insanity defense.[5] In addition, the state could have called the doctor whom it sought for the additional examination to opine that the methodology employed by Henry's experts in examining and reaching their conclusions was unsound.
Henry's competence and rationality were suspect. The court found the mental mitigating factors in the penalty phase. While *72 these do not rise to the level of insanity, they do suggest that Henry may have had a viable insanity defense of which he was deprived.
On the other issues raised by Henry, I am in accord with the majority opinion and concur therewith. I believe, however, that Henry is entitled to a new trial because the court improperly struck his insanity defense.
BARKETT, Justice, dissenting.
I concur with Justice McDonald's opinion concluding that the trial court erred in striking Henry's insanity defense.
However, I also believe that Florida law mandates the suppression of Henry's confession. When a defendant is incarcerated and given his Miranda[6] rights, the response can be categorized in only one of three possible ways: (1) it is clear that the rights have been asserted; (2) it is clear that the rights have been waived; or (3) it is unclear whether the rights have been asserted or waived.
Henry made the following statement: "I am not saying nothing to you. Besides you ain't read me nothing yet." This statement cannot possibly be deemed a clear waiver of his rights. At the very least, a fair interpretation of this statement is that it is an equivocal assertion of his rights.
In Long v. State, 517 So.2d 664, 667 (Fla. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988), we said police must cease all custodial interrogation of a defendant who makes an equivocal request for his Miranda rights until police clarify the meaning of the equivocal request. See also Thompson v. State, 548 So.2d 198, 203 (Fla. 1989) ("but I don't have the money to pay an attorney"); Kyser v. State, 533 So.2d 285, 286 (Fla. 1988) ("I think I want to talk to a lawyer before I talk about that"); Waterhouse v. State, 429 So.2d 301, 305 (Fla.) ("I think I want to talk to an attorney before I say anything else"), cert. denied, 464 U.S. 977, 104 S.Ct. 415, 78 L.Ed.2d 352 (1983); Cannady v. State, 427 So.2d 723, 728 (Fla. 1983) ("I think I should call my lawyer"). Accord Christopher v. Florida, 824 F.2d 836, 841-42 (11th Cir.1987) (right to remain silent), cert. denied, 484 U.S. 1077, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988); Martin v. Wainwright, 770 F.2d 918, 923-24 (11th Cir.1985) (right to cut off questioning), modified on other grounds, 781 F.2d 185 (11th Cir.), cert. denied, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986).
Long was questioned by police concerning his arrest for abduction, kidnapping, and involuntary sexual battery. Police obtained a confession to those crimes and then began questioning him about unrelated murders. Long then said to detectives: "I think I might need an attorney." Long, 517 So.2d at 666. The failure of police to immediately cease interrogating Long and determine the meaning of his equivocal request for counsel mandated the suppression of his subsequent confession. Id. at 667.
The majority fails to even discuss, much less analyze, Long and its progeny. It attempts to dismiss Long by a cursory observation that Long pointed out that all questioning must cease when an accused invokes his right to counsel. It fails to address the issue presented and resolved in Long: what is a police officer's obligation when the accused unclearly or equivocally asserts a Miranda right? Long requires that before any further interrogation, the officers must clarify whether the defendant is in fact asserting his constitutional rights. This was not done here. Therefore, the law requires the suppression of Henry's confession.
KOGAN, J., concurs.
PER CURIAM.
Justices Overton, Ehrlich and Grimes join in all parts of the majority opinion. Chief Justice Shaw joins in parts I, III and IV of the majority opinion. Justice McDonald joins in parts I, II and IV of the majority opinion. Justices Barkett and Kogan join in parts I and IV of the majority opinion. While a majority of justices *73 have concurred in each part of the majority opinion, Chief Justice Shaw and Justices McDonald, Barkett and Kogan have each dissented from at least one part thereof. Because a majority of the justices believe that reversible error was committed, albeit for different reasons, we find it necessary to reverse the judgment of guilt and the sentence of death,[7] and remand the case for a new trial.
SHAW, C.J., and OVERTON, McDONALD, EHRLICH, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Henry also argues that the police coerced his confession with threats and further that, because of his IQ of 78 and drug use, the confession was not voluntary. We have examined the record and find no reason to reverse the trial judge's finding that the confession was voluntary and not coerced.
[3] If the emphasis is placed on the word "you," this conclusion would be inescapable; and it must be remembered that the finder of fact denied Henry's motion to suppress his confession.
[4] Defense counsel acknowledged that the trial court could appoint a third examining doctor, but argued he or she should be a neutral court-appointed doctor and not one named solely by the state.
[5] Henry fully cooperated with these examinations.
[6] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[7] In view of our disposition of the case, we have not addressed Henry's arguments with respect to the penalty phase of the trial.