ON MOTION FOR CLARIFICATION
 

 LEWIS, J.
 

 We grant the State’s Motion for Clarification, withdraw our previous opinion, and substitute the following opinion in its place.
 

 Meigo Bailey, Appellant, was convicted of first-degree murder, second-degree murder, attempted second-degree murder, burglary of a dwelling, and two counts of attempted robbery. He appeals these convictions, arguing that the trial court erred in admitting an audio-recorded statement, which he contends was taken in violation of his right against self-incrimination. For the reasons that follow, we affirm.
 

 On December 2, 2004, Appellant was shot during an alleged home-invasion robbery attempt, and as a result, he was hospitalized. On December 6, 2004, Detectives Padgett and Parrales went to the hospital to interview Appellant about the alleged robbery attempt. There is no recording of this interview. According to Detective Padgett, he read Appellant his Miranda
 
 [1]
 
 rights and ascertained that he understood them before proceeding with substantive questioning. Detective Pad-gett testified that Appellant began to talk with him about various robberies Detective Padgett had already been investigating. This conversation led to information regarding a murder that had been the result of a home-invasion robbery on Phillips Highway on November 9, 2004. Detective Padgett recalled that Appellant admitted to being involved in this crime and was able to give details about the crime, including which firearms were used. According to the information Appellant provided Detective Padgett, Appellant remained outside the home while his companions went inside. While Appellant was outside, he heard shots fired. When Appellant’s companions emerged from the home, one of them informed Appellant that “it had gone wrong.” At the end of the interview, Detective Padgett told Appellant he would return the next day with a homicide detective.
 

 The next day, Detective Padgett returned, as promised, with three other detectives: Parrales, Gupton, and Meacham. Detectives Gupton and Meacham both carried digital audio recorders, and the majority of Appellant’s interaction with the officers was recorded. The pertinent portions of the recording were played for the trial court at the suppression hearing, and we have listened to those portions as well.
 
 [2]
 

 When the officers arrived at the hospital on December 7, 2004, Detective Gupton reviewed a constitutional rights form with Appellant, which Appellant referred to as a “Waiver of Rights Form” in the proceedings below. The audio recording reflects that Detective Gupton read each right aloud and asked Appellant if he understood each one. Not all of Appellant’s responses are audible, but each audible response is “Yes.” At the suppression hearing, Detective Gupton testified that Appellant appeared to understand the form, did not have any questions about it, and did not ask for a lawyer. The form itself reflects that Appellant placed his initials next to each right and signed at the bottom.
 

 
 *811
 
 After reading Appellant’s rights and ascertaining that Appellant understood them, Detective Gupton asked Appellant some preliminary questions regarding his background and his gunshot wound before proceeding to substantive questioning. The substantive questioning began with the following exchange:
 

 DET GUPTON: Meigo, in speaking with Detective Padgett, as he had said, there was an incident that occurred on Phillips Highway.
 

 MR. BAILEY: Uh huh.
 

 DET GUPTON: Are you aware of that incident? I ...
 

 MR. BAILEY: Yes sir.
 

 DET GUPTON: I’m sorry. Could you do me a favor, Meigo, and try to talk a little louder.
 

 MR. BAILEY: Yes, sir.
 

 DET GUPTON: Okay. I know it’s hard but it helps me understand things clearer. What can you tell me about that incident?
 

 MR. BAILEY: Man, I don’t really want to talk about that (inaudible).
 

 DET PADGETT: Why is that?
 

 MR. BAILEY: Huh?
 

 DET PADGETT: Why is that?
 

 MR. BAILEY: Cause I don’t want no record of it on tape[.]
 

 DET PADGETT: Cause what?
 

 MR. BAILEY: Cause I don’t want to record on tape or nothing like that.
 

 DET GUPTON: Okay, well, I’ll tell you what. I’ll turn mine off, okay? I’ll turn it off. How about that?
 

 MR. BAILEY: You sure you (inaudible)?
 

 DET GUPTON: What?
 

 MR. BAILEY: (Inaudible)
 

 DET GUPTON: Yeah.
 

 [[Image here]]
 

 MR. BAILEY: Let me see it. Is it turned off? Let me see it. Is it turned off?
 

 DET PADGETT: Yep. Ain’t no tape in it is there?
 

 DET MEACHAM: Naw, it’s just a little digital thing. It’s shut off.
 

 DET PADGETT: Digital recorder, that’s all.
 

 MR. BAILEY: Okay.
 

 After this exchange, the interview continued. Appellant repeated the information he had given to Detective Padgett the day before, named the other perpetrators, and described the home where the November 9, 2004, robbery and murder occurred.
 

 In his motion to suppress the interview, Appellant argued that he was attempting to invoke his right to remain silent when he stated, “Man, I don’t really want to talk about that.” He contended that, based on this statement, the officers should have ended the interrogation and were not permitted even to ask clarifying questions. Instead, he argued, the officers should have honored his right “to cut off questioning.” After a hearing, the trial court denied the motion, opining that “what the officers did was appropriate under the circumstances.” The recording was played at trial, and the jury ultimately convicted Appellant of several crimes based on the incident that occurred on Phillips Highway on November 9, 2004.
 

 On appeal, Appellant contends that the trial court erred in failing to deem his statement, “Man, I don’t really want to talk about that,” an unequivocal invocation of his right to remain silent. He relies primarily on
 
 Cuervo v. State,
 
 967 So.2d 155 (Fla.2007), for his contention that the admission of his incriminating statements was erroneous. The State contends that the instant case is indistinguishable from
 
 Owen v. State,
 
 862 So.2d 687 (Fla.2003),
 
 *812
 
 and that, as a result, we must affirm. We, however, find key factual distinctions between the instant case and each of the cases the parties cite.
 

 The factual distinctions between the instant case and the cases the parties cite illustrate the following point, made by the Florida Supreme Court in
 
 State v. Glatzmayer,
 
 789 So.2d 297, 301 (Fla.2001):
 

 Suppression issues are extraordinaiity rich in diversity and run the gamut from (1) pure questions of fact, to (2) mixed questions of law and fact, to (3) pure questions of law. Reviewing courts must exercise care when examining such issues, for while the issues themselves may be posed in broad legal terms ..., the actual ruling is often discrete and factual....
 

 (footnotes omitted). After noting the marked diversity in suppression issues, the
 
 Glatzmayer
 
 court emphasized, “As with all trial court rulings, a suppression ruling comes to the reviewing court clad in a presumption of correctness as to all fact-based issues, and the proper standard of review depends on the nature of the ruling-in each case.”
 
 Id.
 
 (footnotes omitted).
 

 An appellate court reviewing a ruling on motion to suppress is required to “interpret the evidence and all reasonable inferences and deductions therefrom in a manner most favorable to sustaining the trial court’s ruling.”
 
 See Connor v. State,
 
 803 So.2d 598, 605 (Fla.2001);
 
 Alvarez v. State,
 
 890 So.2d 389, 392 (Fla. 1st DCA 2004) (noting that a trial court’s inferences regarding the findings of historical fact are entitled to “appropriate weight”). It has also been observed, however, that to the extent a ruling is based on an audio recording, “the trial court is in no better position to evaluate such evidence than the appellate court, which may review the tape for facts legally sufficient to support the trial court’s ruling.”
 
 Dooley v. State,
 
 743 So.2d 65, 68 (Fla. 4th DCA 1999) (citing
 
 Almeida v. State,
 
 737 So.2d 520, 524 (Fla.1999)). In any event, the constitutional issues involved in a ruling on a motion to suppress, i.e. the trial court’s application of the law to the facts, should be reviewed de novo.
 
 Connor,
 
 803 So.2d at 605;
 
 Cuervo,
 
 967 So.2d at 160.
 

 Our decision in this case results from the interplay of all of these standards, as well as the general notion that, as an appellate court, we always presume that a trial court’s decision is correct until the appellant has met the burden of showing error.
 
 See
 
 Philip J. Padovano,
 
 Florida Appellate Practice
 
 § 18:2 at 336 (2009 ed.). In the absence of such a showing, affir-mance is required.
 
 Id.
 

 With these principles in mind, we turn to the substantive law, beginning with the well-settled rule that, to protect a suspect’s rights under the constitutions of the United States and Florida, an officer must give
 
 Miranda
 
 warnings before conducting a custodial interrogation.
 
 See Miranda v. Arizona,
 
 384 U.S. 436, 473-74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); see
 
 Traylor v. State,
 
 596 So.2d 957, 961 (Fla.1992). Protection of the rights recognized in both constitutions requires that if the suspect “indicates in any manner” that he or she does not want to be interrogated, the interrogation must not begin or, if it has already begun, must stop.
 
 Miranda,
 
 384 U.S. at 473-74, 86 S.Ct. 1602;
 
 Traylor,
 
 596 So.2d at 961. Once a suspect has validly waived his or her
 
 Miranda
 
 rights, officers are not required to stop an interrogation unless the suspect unequivocally invokes those rights.
 
 State v. Owen,
 
 696 So.2d 715, 717 (Fla.1997);
 
 accord Davis v. United States,
 
 512 U.S. 452, 458-59, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (holding that officers are not required to terminate an interrogation upon a suspect’s reference to an attorney unless the reference is an
 
 *813
 
 unequivocal assertion of the right to counsel). If the suspect makes an equivocal or ambiguous reference to the right to remain silent after having validly waived that right, officers may continue the interrogation without attempting to clarify the meaning behind the reference.
 
 Owen,
 
 696 So.2d at 717.
 

 In
 
 Alvarez v. State,
 
 15 So.3d 738, 743-45 (Fla. 4th DCA 2009), the Fourth Distinct explained the distinction between the standards applicable to a suspect’s initial waiver of his or her constitutional rights and a subsequent invocation of those rights as follows:
 

 Invocation and waiver of constitutional rights are distinct inquiries, though, and should not be merged.
 
 See Smith v. Illinois,
 
 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). The state must prove by a preponderance of the evidence that a suspect has voluntarily, knowingly, and intelligently waived his
 
 Miranda
 
 rights before a statement may be used against him.
 
 See Colorado v. Connelly,
 
 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986);
 
 Ramirez v. Stale,
 
 739 So.2d 568, 575 (Fla.1999). Thus, an ambiguous waiver must be clarified before initial questioning.
 
 See [U.S. v.] Rodriguez,
 
 518 F.3d [1072] at 1080 [ (9th Cir.2008) ]. However, once a suspect has waived his rights, an attempt to revoke the waiver must be unambiguous.
 
 See Owen,
 
 696 So.2d at 717-718;
 
 Collins v. State,
 
 4 So.3d 1249, 1250 (Fla. 4th DCA 2009). Unlike the pre-waiver context, an ambiguity need not be clarified before proceeding with questioning.
 
 See Davis,
 
 512 U.S. at 459, 114 S.Ct. 2350;
 
 Given,
 
 696 So.2d at 717;
 
 Collins,
 
 4 So.3d at 1250. This rule regulates the tension recognized in
 
 Miranda
 
 between, on the one hand, the preservation of the right against self-incrimination and, on the other, the need for clear rules for law enforcement in the field.
 
 See Davis,
 
 512 U.S. at 461, 114 S.Ct. 2350.
 

 Id.
 
 at 745. The Fourth District’s discussion of pre-waiver and post-waiver analysis is consistent with case law from the Florida Supreme Court, such as
 
 Almeida v. State,
 
 737 So.2d 520, 524 (Fla.1999), where the court noted that an equivocal or ambiguous invocation of the right to remain silent would be insufficient to “trump a [prior] clear waiver” of that right. The instant case requires a post-waiver analysis.
 
 [3]
 
 More specifically, it requires us to decide whether Appellant’s statement, “Man, I don’t really want to talk about that,” was unequivocal. If it was, then the officers should have cut off questioning.
 

 In arguing that the statement was equivocal, the State notes the similarity between the phrasing of Appellant’s statement and the phrasing of some statements deemed equivocal in
 
 Owen v. State,
 
 862 So.2d 687 (Fla.2003). The statements at issue in
 
 Owen
 
 were “I don’t want to talk about it” and “I’d rather not talk about it.”
 
 Id.
 
 at 696-97. In deeming these utterances equivocal, the Florida Supreme Court provided the following information about them context:
 

 Owen’s ambiguous responses came ... when he was being interrogated by Of
 
 *814
 
 ficers Lincoln and Wood about the Slattery homicide. Owen had not yet confessed at the time he made the statements. Lincoln asked Owen, “There’s a few things that I have to know, Duane. A couple pieces don’t fit. How did it come down? Were you looking at the particular house or just going through the neighborhood?” Owen’s response was, “I’d rather not talk about it.” A short time later, following additional questions and answers, Lincoln asked, “Now, did you have a bicycle? Of course you did. Now, where did you put it?” Owen answered, “I don’t want to talk about it.”
 

 Id.
 
 at 697 n. 6. The
 
 Owen
 
 court held that the interrogating officers had no duty to either terminate questioning or ask questions to clarify the defendant’s responses “in the context presented.”
 
 Id.
 
 at 697-98. In one of the
 
 Owen
 
 defendant’s prior appeals, the supreme court had characterized the questions that elicited the equivocal responses as concerning “relatively insignificant details of the crime.”
 
 State v. Owen,
 
 696 So.2d 715, 717 (Fla.1997).
 

 Essentially contending that the context of a challenged statement is more important than the exact wording, Appellant directs our attention to
 
 Cuervo v. State,
 
 967 So.2d 155 (Fla.2007). The interrogation in
 
 Cuervo
 
 was conducted through a translator because the suspect spoke only Spanish and the lead officer spoke only English. 967 So.2d at 162. A Spanish-speaking officer read the defendant each of the
 
 Miranda
 
 rights from a pre-printed form prepared in Spanish by the Sheriffs Office.
 
 Id.
 
 at 157. The Spanish-speaking officer then asked the defendant whether he understood each of the rights that had just been read.
 
 Id.
 
 The defendant answered, “[Yjes,” and the Spanish-speaking officer then asked, “Do you wish to talk about the matter and make a statement, yes or no?”
 
 Id.
 
 The defendant answered, “No quiero declarar nada,” which is literally translated as, “I don’t want to declare anything.”
 
 Id.
 
 After confirming this statement with the defendant, the Spanish-speaking officer told the lead officer, “He does not wish to talk with us.”
 
 Id.
 
 The lead officer instructed the Spanish-speaking officer to have the defendant initial the rights form line-by-line and sign it at the bottom.
 
 Id.
 
 After the defendant complied, the lead officer instructed the Spanish-speaking officer to tell the defendant that he could give “his side of the story” if he wanted to.
 
 Id.
 
 The Florida Supreme Court held that the
 
 Cuervo
 
 defendant’s statement that he did not want to “declare anything” was a “clear invocation of the right to remain silent” and that no further questioning should have ensued.
 
 Id.
 
 at 164.
 

 In explaining its holding, the
 
 Cuervo
 
 court emphasized that the defendant’s invocation of the right to silence “came solely in response to the inquiry concerning his
 
 Miranda
 
 rights, before any questions specific to the crime were asked.” 967 So.2d at 163. The
 
 Cuervo
 
 court distinguished
 
 Owen
 
 because the statements deemed equivocal there were made “during the course of an interrogation.”
 
 Id.
 
 Based on the context of the statements at issue in
 
 Owen,
 
 the
 
 Cuervo
 
 court noted that they “could have been referring [either] to specific questions about the crime or to the underlying right to cut off all questioning.”
 
 Id.
 
 The
 
 Cuervo
 
 court also found it significant that the defendant had already invoked his rights by saying, “No quiero declarar nada,” by the time the officers asked him to sign the rights form.
 
 See id.
 
 at 164.
 

 Although we do not agree with Appellant that the ruling in the instant case was erroneous, we do agree that context is generally as important, if not more impor
 
 *815
 
 tant, than the exact words a suspect uses in a statement that is alleged to be an invocation of the right to remain silent. We also note the Fourth District’s observation in
 
 Alvarez
 
 that “courts have been more apt to find a revocation of a waiver of the right to remain silent unambiguous and unequivocal if made
 
 before
 
 substantive questioning.” 15 So.3d at 744. We believe this trend is logical, for the reasons expressed by the
 
 Alvarez
 
 court:
 

 [I]f a suspect has not answered any questions and fails to clearly waive his right to remain silent, or has waived his right but then answered only “mundane” questions before any substantive questioning, announcing he does not want to answer anymore, it is reasonable to conclude that he has decided not to speak. However, where a suspect has heard, understood, and waived his
 
 Miranda
 
 rights, and has been answering substantive questions without incident and continues to do so, a statement which may have been unambiguous if uttered initially may be objectively ambiguous when considered in context.
 

 Id.
 
 at 745. Despite these general principles, we believe that, on the record before us, Appellant has not met his burden to show that the trial court erred in concluding that the officers’ response to Appellant’s statement was reasonable under the circumstances.
 

 As noted above, the parties have not cited any case with facts so similar to those presented here that we are compelled to agree with either side. We agree ■with the State that the words Appellant used in the instant ease were similar to the words used in
 
 Owen.
 
 We also acknowledge that here, as in
 
 Owen,
 
 the statement at issue came in response to a question about the crime, rather than a question concerning whether Appellant wanted to waive his rights. However, these observations do not settle the matter. One key distinction between the instant case and
 
 Owen
 
 is that the statement at issue was made at the beginning of the substantive questioning, rather than after hours of questioning. Similarly, this case is not resolved simply by an acknowledgement that, as in
 
 Cuervo,
 
 the statement in question was made at the beginning of the interview before the officers began to ask difficult, specific questions about the crime.
 
 Cuervo
 
 is distinguishable because the statement at issue here came after a valid waiver of
 
 Miranda
 
 rights and was not made in response to an inquiry as to whether Appellant wished to waive those rights. These critical distinctions illustrate that the instant case cannot be resolved merely by analogy to
 
 Owen
 
 or
 
 Cuervo.
 

 Because we have found no case that is more closely analogous than either
 
 Owen
 
 or
 
 Cuervo,
 
 we are left to draw our own conclusions regarding the specific statement Appellant uttered. In most appeals, courts have only the cold record to consider. In this case, we had the relatively unique opportunity to listen to the statement as it was uttered at the time of the interview. If we had only the cold record to consider here, we might be persuaded that the
 
 Alvarez
 
 court’s reasoning requires reversal, as Appellant did make the statement at issue at the inception of the substantive questioning. Because, like the trial court, we were able to listen to the interview, we were able to consider the manner in which the words at issue were expressed and determine whether the officers responded reasonably.
 

 Having listened to the pertinent portions of the recording, we can understand why the trial court reached the result it did. At first blush, the transcribed words “Man, I don’t really want to talk about that” may appear rather emphatic. How
 
 *816
 
 ever, the State has noted, and we agree, that the word “really” is not always used to express emphasis, but is sometimes used in a hedging manner. This point led us to consider the words in their audible context. From the recording, we know that Appellant essentially mumbled the words in question and followed them with additional, indecipherable language. The words on the recording simply do not come across as a clear assertion of a right. Therefore, we cannot say that the trial court erred in concluding that Appellant’s words were insufficient to trump his prior waiver of his right to remain silent. Accordingly, Appellant’s judgments and sentences are AFFIRMED.
 

 WEBSTER and DAVIS, JJ., concur.
 

 [1]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [2]
 

 . As the supreme court noted in
 
 Almeida v. State,
 
 737 So.2d 520, 524 n. 5 (Fla.1999), "[t]he trial court had no special vantage point in reviewing this tape.”
 

 [3]
 

 . In his arguments to this Court, Appellant notes that after having him sign the rights form, the officers never asked whether he wished to waive those rights, arguably implying that a pre-waiver analysis applies. However, Appellant failed to argue to the trial court that he did not waive his rights before stating that he "really [didn’t] want to talk about that.” Instead, in his motion to suppress, Appellant referred to the rights form as a "Waiver of Rights Form” and argued that Appellant was asserting his right to cut off questioning (rather than to avoid being interrogated altogether) when he made that statement.