QUINCE, J.,
dissenting.
I respectfully dissent from the majority’s decision to affirm both the defendant’s conviction and his sentence. I concur fully with Justice Pariente’s determination that the penalty phase was tainted by multiple improper closing arguments by the prose *874 cutor and that these arguments deprived Braddy of a fair penalty phase proceeding. However, I also dissent as to his conviction because I conclude that the trial court’s denial of Braddy’s motion to suppress was not supported by competent and substantial evidence. I conclude that the actions of the State in questioning the defendant violated his right to remain silent. Thus, any information obtained thereby should have been suppressed. I would remand this case for a new trial.
Unequivocal Invocation after First Waiver of the Right of Silence
As the majority notes, Braddy did receive proper Miranda[18] warnings and waived his Miranda rights. Majority op. at 830. However, he also unequivocally revoked his waiver when he told police he was tired of talking to them and wanted to go to jail.[19] The relevant standard for such a revocation is whether “a reasonable police officer under the circumstances would understand that the suspect is invoking the right.” Womack v. State, 42 So.3d 878, 883 (Fla. 4th DCA 2010). The officers in this case actually did understand Braddy’s statement as an invocation of the right to remain silent, a fact conceded by the State at oral argument and also demonstrated by one detective’s affirmative answer to the question, “Does there come a time when Braddy tells you specifically that he no longer wants to speak to you?” It is also relevant that the detectives ceased questioning Braddy after this invocation. Pierre v. State, 22 So.3d 759, 767-68 (Fla. 4th DCA 2009) (stating that when a detective fell silent and discontinued questioning after the defendant stated he was not going to say anything and remained silent, “the only interpretation ... is that, as a reasonable police officer, [the detective] understood [the defendant’s] statement to be a demand that questioning cease”); Dixon v. State, 72 So.3d 171, 176 (Fla. 4th DCA 2011) (finding detective’s statement to “hear me out, since you don’t want to talk about the house I’ll talk about the house, so you just hear me out, I’m not gonna ask you any questions” indicated detective’s understanding that the defendant wanted questioning to cease after the defendant expressed his desire not to talk anymore).
The majority correctly notes that Wom-ack requires us to consider whether the statement referred to a desire to stop answering certain specific questions or to instead cut off all questioning. 42 So.3d at 883. However, in this context, Braddy’s comment was not made in response to a specific question. When asked about Qua-tisha’s location, Braddy answered the question by volunteering information about where he had last seen Quatisha. He then told police he was tired of talking and wanted to be taken to jail. Thus, he exercised his right after answering the question, not in response to it.
The present case is also distinguishable from State v. Owen, 696 So.2d 715, 720 (Fla.1997), and Bailey v. State, 31 So.3d 809, 811 (Fla. 1st DCA 2009), which the majority cites as examples of cases where the defendant did not unequivocally invoke his right to remain silent. See majority *875 op. at 830-31. In Owen, the defendant responded to police questions about “relatively insignificant details of the crime,” by stating, “I’d rather not talk about it,” and “I don’t want to talk about it.” Owen, 696 So.2d at 717 n. 4 (emphasis added). In Bailey, the defendant, who had validly waived his Miranda rights, later responded to a question about a murder that resulted from a home invasion robbery by saying “[m]an, I don’t really want to talk about that.” Bailey, 31 So.3d at 811.
The instant case differs from Owen and Bailey in several important ways. First, unlike Owen, Braddy’s statement was not in response to an insignificant question. He was being asked about the location of Quatisha Maycock — the main focus of the detectives’ investigation at that point. Second, unlike Owen and Bailey, Braddy did not state that he was tired of talking about something in particular. He indicated a desire to stop talking altogether — to terminate the interview and be taken to jail. As we clarified in Owen, “[Tjhere are no magic words that a suspect must use in order to invoke his or her rights.” 696 So.2d at 719. Braddy’s comments qualify as an unequivocal invocation of his right to remain silent.
No Second Waiver of the Right of Silence
Braddy did not revoke his invocation when he told the police two hours later that he would take them to where he left Quatisha. Such revocation does not occur simply because the defendant has reinitiat-ed communication with the police. The United States Supreme Court has established the analysis for determining whether a defendant who has initiated further conversation with police after invoking his right to remain silent has waived that right. See Oregon v. Bradshaw, 462 U.S. 1039, 1044-46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In Welch v. State, 992 So.2d 206, 214 (Fla.2008), we outlined this analysis as having three requirements: (1) that the defendant initiates further conversation; (2) that the defendant is reminded of his or her rights; and (3) that the defendant knowingly and voluntarily waives those rights a second time. Even if the accused has initiated contact with police after invoking his or her rights, incriminating statements made during this contact cannot be admitted unless these three requirements are met. Id.
There is no question that Braddy initiated communication with the police. When Detective Suco reentered the interview room, Braddy jumped down from a chair and immediately volunteered to take the police to where he had left Quatisha. Detective Suco did not speak to Braddy before Braddy made this comment; nor did Braddy’s comment concern a routine matter related to Braddy’s confinement in the interview room. See Bradshaw, 462 U.S. at 1045, 103 S.Ct. 2830 (“[Sjome inquiries, such as a request for a drink of water ... are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating ... to the investigation. Such inquiries ... will not generally ‘initiate’ a conversation....”). Although Braddy’s situation met the first requirement, the other two requirements to establish a waiver are nonexistent.
After Braddy volunteered to take the police to Quatisha’s location, he was not reminded of his right to remain silent. Even after leading the officers around the Palm Beach site by car, Braddy was not reminded of his Miranda rights. In fact, the only time the police administered the Miranda warnings to Braddy was at the beginning of their interrogations — some sixteen hours before he reinitiated communication. Additionally, none of the events that occurred after Braddy’s initiation of *876 the conversation prove that Braddy made a knowing and voluntary waiver of his rights. Therefore, although Braddy did initiate conversation when he told police he would take them to where he had dropped off Quatisha, that initiation did not constitute a waiver of his right to remain silent because he was not reminded of his rights and did not knowingly and voluntarily waive those rights.
Police Did Not Scrupulously Honor Braddy’s Right of Silence
Without this waiver, we are left with Braddy’s invocation of his right to remain silent, and the question turns to whether the police scrupulously honored that right. Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (“[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his ‘right to cut off questioning1 was ‘scrupulously honored.’ ”). As part of this analysis, it must first be established that Braddy was “interrogated” by the police after having exercised his right to remain silent. It is clear that Braddy’s volunteered statement about taking the police to where he had left Quatisha, while incriminating, does not constitute interrogation by the police. See Rhode Island v. Innis, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).
“Interrogation,” as that term is defined under Miranda, “refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.” Id. at 301, 100 S.Ct. 1682 (footnotes omitted).[20] This includes police practices that officers “should have known were reasonably likely to elicit an incriminating response.” Id. at 302, 100 S.Ct. 1682. In the present case, Detective Smith’s physical assault on Braddy after Braddy exercised the right of silence constitutes interrogation. Not only did Smith yank Braddy out of the car and pin him to the side of the car by placing his forearm across Braddy’s neck, but Smith also questioned Braddy about Quati-sha’s location. Smith’s actions were known, or at least should have been known, to be reasonably likely to evoke an incriminating response from Braddy. In fact, in Lowe v. State, 650 So.2d 969, 973 (Fla.1994), this Court highlighted the comments of the United States Supreme Court in Arizona v. Mauro, 481 U.S. 520, 529-30, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987), that “[i]n deciding whether particular police conduct is interrogation [under Innis[21]], we must remember the purpose behind our decisions in Miranda and Edwards: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment.” What could violate this principle more than an officer using actual physical force in an attempt to gain information? Thus, Smith interrogated Braddy in violation of Brad-dy’s right to remain silent.
*877 From Mosley,[22] this Court derived five factors for determining whether the police have scrupulously honored a defendant’s right to remain silent: (1) whether new Miranda warnings were given; (2) whether the officer immediately ceased questioning after the unequivocal invocation of the right to silence; (3) the length of time between the interrogations; (4) whether the interrogation subsequent to invocation took place in a different location; and (5) whether the subsequent interrogation involved a different crime. Globe v. State, 877 So.2d 663, 670 (Fla.2004) (quoting Henry v. State, 574 So.2d 66, 69 (Fla.1991)). However, variance as to one or more of the factors is not dispositive and the factors should be considered under a totality of the circumstances analysis. Id.
Applying the first factor to the present case, Braddy was not given a fresh set of Miranda warnings at any point after his invocation. Second, the detectives did cease questioning immediately after Brad-dy exercised his right to remain silent. Third, approximately two hours had passed before Smith began the second interrogation. Fourth, the second interrogation occurred in a different location (at the Palm Beach site) than the first (at the Alligator Alley station). Finally, the second interrogation concerned the same crime as the first interrogation.
When comparing these results to the precedent cases, factors one and five lead me to conclude that the police failed to scrupulously honor Braddy’s rights. He did not receive a new Miranda warning and was questioned about the same crime that was the subject of the first interrogation. Factor three is debatable because the approximate two-hour time period between interrogations in this case is similar to that in Mosley,[23] but shorter than the intervals in other cases where the police were found to have scrupulously honored a defendant’s rights.[24] However, under a totality of the circumstances approach, factors one and five and the physical coercion that occurred — in violation of the very principle that these factors were designed to address — outweigh the other factors. See Mosley, 423 U.S. at 104, 96 S.Ct. 321 (“The requirement that law enforcement authorities must respect a person’s exercise of [the option to terminate questioning] counteracts the coercive pressures of the custodial setting.”). Therefore, considering the weight of the factors and that the second interrogation included physical violence against Braddy, it is clear to me that the police did not scrupulously honor Braddy’s invocation.
Voluntariness of Incriminating Statements
Detective Smith’s use of physical force against Braddy is also relevant in determining the voluntariness of Braddy’s confession and the incriminating statements he made. In order to be admitted into evidence, a confession or incriminating statement “must be freely and voluntarily made.” Frazier v. State, 107 So.2d 16, 21
*878 (Fla.1958). Voluntariness requires that the defendant’s mind be “uninfluenced by either hope or fear” at the time the statement is made. Id. Therefore, the confession must not be “extracted by any sort of threats or violence ... for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner.” Hawthorne v. State, 377 So.2d 780, 784 (Fla. 1st DCA 1979) (quoting Brain v. United States, 168 U.S. 532, 542-43, 18 S.Ct. 183, 42 L.Ed. 568 (1897)). This Court has stated that “[t]he confession should be excluded if the attending circumstances, or the declarations of those present at the making of the confession, are calculated to ... exert improper and undue influence over [the declarant’s] mind.” Brewer v. State, 386 So.2d 232, 235-36 (Fla.1980) (quoting Frazier, 107 So.2d at 21).
Although the trial court found that Smith’s use of force was “not of such force and effect as to overcome [Braddy’s] will” I conclude that Smith’s physical attack on Braddy violates the principles set forth above. While the majority is correct that the trial court’s ruling on the motion to suppress comes to us “clothed with the presumption of correctness,” majority opinion at 829, that deference only applies to the trial court’s findings as to “historical facts.” Connor v. State, 803 So.2d 598, 608 (Fla.2001). In contrast, “the ultimate issue of voluntariness is a legal rather than factual question.” Ramirez v. State, 739 So.2d 568, 575 (Fla.1999) (emphasis added) (citing Miller v. Fenton, 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)). However, even if the presumption did apply, the trial court’s ruling was not supported by competent, substantial evidence. “[A] determination of ... the voluntariness of a confession ... requires an examination of the totality of the circumstances.” Lukehart v. State, 776 So.2d 906, 917 (Fla.2000) (citing Jennings v. State 718 So.2d 144, 150 (Fla.1998)). Here, the trial court did not consider the totality of the circumstances, including the fact that Braddy had exercised his right to remain silent at the point of this physical coercion, that Braddy had not revoked that right by initiating communication with the police, that the police did not scrupulously honor Braddy’s right of silence, and that Braddy was kept in close contact with his aggressor from the time following the assault until Braddy was back at the station. The totality of these circumstances points to suppression of Braddy’s incriminating statements made after Smith’s use of physical force.
The majority concludes, without citing any supporting authority, that “any statements made to detectives during the foot search were not incriminatory because all such statements were made in furtherance of Braddy’s deception.” Majority op. at 832. However, this conclusion is not supported by the law. In Hiibel v. Sixth Judicial District Court, the United States Supreme Court held that the Fifth Amendment privilege against compulsory self-incrimination “protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.” 542 U.S. 177, 190, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) (quoting Kastigar v. United States, 406 U.S. 441, 445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)). See also id. at 195, 124 S.Ct. 2451 (Stevens, J., dissenting) (quoting Kastigar, 406 U.S. at 445, 92 S.Ct. 1653) (“By ‘incriminating’ we have meant disclosures that ‘could be used in a criminal prosecution or could lead to other evidence that might be so used.’”). The Supreme Court has also stated that the privilege pertains to “those [statements] which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime.” Hoff *879 man v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). The definition of “incrimination” used in interpreting the Fifth Amendment privilege against compulsory self-incrimination has definite applicability in the context of Miranda, considering that Miranda developed procedures to help safeguard the same rights provided under the self-incrimination clause. Kastigar, 406 U.S. at 445, 92 S.Ct. 1653 (stating that the Supreme Court “has been zealous to safeguard the values that underlie the privilege [against self-inerimi-nation]” and citing Miranda as an example). In State ex rel. Mitchell v. Kelly, 71 So.2d 887, 894 (Fla.1954), this Court specifically cited to the definition provided in Hoffman.
By these standards, the statements Braddy made during the foot search were incriminatory. Such statements included Braddy asking how long it takes for a body to float and remarking that the autopsy performed on Quatisha would show that Braddy did not abuse her. These statements were made at the Palm Beach and Alligator Alley stations after Smith used force that was “calculated to ... exert improper and undue influence over [Brad-dy’s] mind.” Brewer, 386 So.2d at 236 (quoting Frazier, 107 So.2d at 21). This coercion, along with continued interrogation by and in the presence of his aggressor, led Braddy to make the incriminatory statements, and such statements should be suppressed.
Voluntariness of Confession
I address Braddy’s confession separately, as it falls under a different standard. “Once it is established that there were coercive influences attendant upon an initial confession [or incriminating statement], the coercion is presumed to continue ‘unless clearly shown to have been removed prior to a subsequent confession.’ ” Id. (quoting State v. Outten, 206 So.2d 392, 396 (Fla.1968)). See also Coffee v. State, 25 Fla. 501, 6 So. 493, 496 (1889) (“[W]hen a confession has ... been made under illegal influences, such influences will be presumed to continue and color all subsequent confessions, unless the contrary is clearly shown.”). Therefore, “[t]he inquiry is whether ... the influence of the coercion that produced the first confession was dissipated so that the second confession was the voluntary act of a free will.” Brewer, 386 So.2d at 236.
Several factors have been used by courts to determine whether coercion has dissipated such that a subsequent confession is admissible. See, e.g., Brewer, 386 So.2d at 237 (holding that “the intervention of appearance before a judicial officer” for fifteen minutes was not enough to dissipate the coercive influences); Gaspard v. State, 387 So.2d 1016, 1023 (Fla. 1st DCA 1980) (holding that a twelve hour interval of time between the coercion and the subsequent confession was not enough on its own to dissipate the improper influences). In Lyons v. Oklahoma, 322 U.S. 596, 604, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944), the United States Supreme Court held that a second confession was freely given even though it followed an initial confession that was improperly obtained by coercion. The Supreme Court found the second confession to be admissible given the following factors: (1) there were twelve hours between the confessions; (2) the second confession was given at a different location; (3) the defendant was given proper warnings prior to the second confession; (4) there was no evidence of force or threats being used to obtain the second confession; and (5) the second confession was taken by a different person than those who had used force against the defendant. Id. at 604-05, 64 S.Ct. 1208.
The Third District considered similar factors in Leon v. State, 410 So.2d 201 *880 (Fla. 3d DCA 1982), in finding a confession admissible even after the defendant was subjected to physical abuse five hours prior. The most important factor in the district court’s decision was that the force was motivated by the necessity of finding a kidnap victim and save his life, not by a desire to force a confession or to elicit incriminating information. Id. at 203. The district court held that in that instance, it was apparent to the defendant that the violence against him was unrelated to whether or not he confessed. Id. at 204. Therefore, the district court noted that the defendant’s very disclosure of the victim’s location was, in itself, a factor that dissipated the initial coercion. Id. The court also noted other relevant factors such as the five-hour interval between the coercion and the confession; that “a complete set of Miranda warnings was meticulously given, understood, and waived” before the confession; and that the confession was secured by officers other than those involved in the coercion. Id. The Eleventh Circuit Court of Appeals reached the same conclusion in considering Leon’s petition for habeas corpus relief. See Leon v. Wainwright, 734 F.2d 770 (11th Cir.1984). The Eleventh Circuit held that “[t]he necessity of saving the victim’s life, the different physical setting, the different group of questioning officers, and the meticulous explanation” of the defendant’s constitutional rights was sufficient “to dissipate the effects of the first coercion.” Id. at 773.
The present case, however, is distinguishable from both Lyons and Leon. Unlike the defendants in those cases, who received Miranda warnings between the abuse and the subsequent confession, Braddy was not given a fresh Miranda warning before his confession. More importantly, neither Lyons nor Leon had invoked their right to remain silent. Braddy actually exercised his right to remain silent — the very purpose of which is to prevent coercion. See Miranda, 384 U.S. at 467, 86 S.Ct. 1602 (“We have concluded that without proper safeguards the process of in-custody interrogation ... contains inherently compelling pressures which work to undermine the individual’s will to resist and to compel him to speak where he would not otherwise do so freely.”). Additionally, the approximately one and a half hours between the coercion and the confession in this case stands in stark contrast to the twelve-hour intervening period in Lyons and the five-hour period in Leon. The time period between the incriminating statements that Braddy made after the coercion and the subsequent confession is less than one and a half hours.
While this case is similar to Leon in that Smith used force to elicit Quatisha’s location from Braddy, not to elicit a confession, this factor still does not favor admission of the confession. The Third District held that giving the police what they wanted (the victim’s location) dissipated the coercive influence in Leon. But in this case, the police were still unable to find Quatisha after Braddy led them to Alligator Alley. Therefore, Braddy’s disclosure was not enough to put Braddy on notice that the police would no longer be using force against him. These factors in totality support a finding that Smith’s use of physical force had not dissipated by the time of Braddy’s confession such that the confession could be introduced into evidence. The confession should have been suppressed.
In Brewer, this Court found a second confession inadmissible on less extensive factors than those in the present case. The defendant Brewer made an initial confession after the interrogating officers threatened him with the electric chair, suggested he would not be given a fair trial, and made promises of leniency. 386 *881 So.2d at 235. The interrogation was then interrupted by a fifteen-minute appearance in front of a judicial officer, who reminded the defendant of his constitutional rights. Id. After first appearance, Brewer went back into the custody of the same officers and gave a second written confession at the officers’ request. Id. This Court found that the second confession should have been suppressed, holding that the intervening appearance before the judicial officer was not enough to overcome the coercive influences of the interrogating officers’ threats and promises. Id. at 237. In contrast, Braddy was subjected to actual physical force, which was used against him after he had invoked his right to remain silent. Thus, his confession is an obvious product of coercion.
In light of the above analysis, Braddy’s motion to suppress should have been granted as to his confession and any other incriminating statements made after Smith’s use of force. Given the totality of the circumstances, admission of this evidence was not harmless error. In determining harmless error, the analysis is “whether there is a reasonable possibility that the error affected the verdict.” State v. DiGuilio, 491 So.2d 1129, 1139 (Fla. 1986). Prior to Smith’s physical attack on Braddy, the only incriminating statement made by Braddy was that he had last seen Quatisha alive in Palm Beach. The other evidence produced by the State did not connect Braddy to Quatisha’s death at Alligator Alley. Therefore, without the improperly admitted statements and confession, there is a reasonable possibility that the jury would have found Braddy not guilty on at least the first-degree murder charge. See Cuervo v. State, 967 So.2d 155, 167 (Fla.2007) (finding failure to suppress defendant’s confession was not harmless where State presented no forensic evidence connecting defendant to the crime and no additional pretrial confession). Thus, the denial of Braddy’s motion to suppress was not harmless, and I would reverse and remand for a new trial as to Braddy’s guilt.
PARIENTE, J., concurs.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Contrary to what the majority states, the record before this Court is unclear whether the defendant stated he was tired of talking and if police did not believe him, they could take him to jail. Some of the police testimony and the written notes of Detective Suco established that Braddy stated he was tired of talking and wanted to go to jail. However, at trial Suco testified for the first time that Brad-dy’s statement was "If we don't believe him, you know, he's tired of talking to us, just take him to jail.”

. Compare Cuervo v. State, 967 So.2d 155, 164-65 (Fla.2007) (holding that under Innis the police "engaged in conduct they could reasonably anticipate would elicit an incriminating response” when they told the defendant, after he had invoked the right of silence, that he could give "his side of the story” and that if he wished to talk, "there’s still time”), with Everett v. State, 893 So.2d 1278, 1286 (Fla.2004) (holding that “neither the service of the arrest warrant nor the request that Everett consent to providing physical evidence” constituted interrogation under In-nis ).

. Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

.Michigan v. Mosley, 423 U.S. 96, 106, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (holding that police scrupulously honored defendant’s right to remain silent when they "immediately ceased the interrogation, resumed questioning [in a different location] only after the passage of a significant period of time and the provision of a fresh set of [Miranda ] warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation”).

. The time interval was "more than two hours” in Mosley. 423 U.S. at 104, 96 S.Ct. 321.

. Globe, 877 So.2d at 670, involved a seven and a half hour time period; and Henry v. State, 574 So.2d 66, 70 (Fla.1991), involved a time period of "at least six hours.”